**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-00901-WJM-NRN

MICHAELLA LYNN SURAT,

Plaintiff,

v.

RANDALL KLAMSER, in his individual capacity, and
CITY OF FORT COLLINS, a municipality,

Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff Michaella Lynn Surat, by and through her attorneys David Lane, Andy McNulty, and Helen Oh of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for her First Amended Complaint and Jury Demand as follows:

## I. INTRODUCTION

1. On the night of April 6, 2017, Plaintiff Michaella Surat was with her boyfriend, Mitchell Waltz, at the Bondi Beach Bar in Fort Collins celebrating her twenty-second birthday.

2. After police officers were called regarding an altercation inside Bondi's involving Waltz, he was asked to leave. Fort Collins Police Services Officers Randall Klamser and Garrett Pastor arrived at the bar and spoke with a bouncer outside about what happened.

3. Ms. Surat walked past Defendant Officer Klamser toward Waltz, only to be stopped by Officer Klamser who was seeking to question Waltz, and who told Ms. Surat to "back off." Officer Klamser then grabbed Ms. Surat by her wrist and placed her in a rear wristlock hold.

4. Still holding Ms. Surat by the wrist, Officer Klamser violently threw Ms. Surat face-first to the ground. Ms. Surat's chin slammed into the sidewalk, causing cervical strain, a concussion, and a large and painful contusion on her chin that later turned purple and black. She also sustained painful bruising on her arms, wrists, knees, and legs.

5. The use of force against Ms. Surat was grossly excessive in violation of the Fourth Amendment to the United States Constitution, and resulted from the deliberately indifferent customs, practices, training, supervision and/or discipline of the City of Fort Collins.

6. Ms. Surat brings this action pursuant to 42 U.S.C. § 1983 against Officer Klamser and the City of Fort Collins for violating the rights guaranteed to her by the Fourth and Fourteenth Amendments to the Constitution of the United States.

## II. JURISDICTION AND VENUE

7. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

8. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

9. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this First Amended Complaint.

## III. PARTIES

10. At all times relevant to this First Amended Complaint, Plaintiff Michaella Surat was a citizen of the United States of America and a resident of the State of Colorado.

11. At all times relevant to this First Amended Complaint, Defendant Randall Klamser was a citizen of the United States and a resident of the State of Colorado and was acting

under color of state law in his capacity as a law enforcement officer employed by the Fort Collins Police Services ("FCPS"). Defendant Klamser is sued in his individual capacity.

12. Defendant City of Fort Collins ("Fort Collins") is a Colorado municipal corporation and is the legal entity responsible for itself and for FCPS.

## IV. FACTUAL ALLEGATIONS

### *A. Defendant Klamser used excessive force during the arrest of Ms. Surat.*

13. At the time of the incident, Plaintiff Michaella Surat was a student at Colorado State University in Fort Collins, Colorado, majoring in Human Development and Family Studies with a concentration in Early Childhood Professions.

14. Ms. Surat is five-feet, nine-inches tall and approximately 115 pounds.

15. On April 6, 2017, Ms. Surat and her then-boyfriend, Mitchell Waltz, went to Bondi Beach Bar in Fort Collins to celebrate her twenty-second birthday with some friends.

16. While inside Bondi Beach Bar, Waltz became involved in an altercation and was asked by Bondi's staff to leave the bar. Staff also called the police.

17. Defendant FCPS Officers Randall Klamser and Garrett Pastor arrived at Bondi Beach Bar shortly before 11:23 p.m. Defendant Klamser stood several feet in front of the bar doors and questioned a Bondi Beach Bar bouncer, Cory Esslinger, about what happened. Pastor stood further outside of the bar on the sidewalk talking to Waltz as Ms. Surat stood on the outside bar patio.

18. Ms. Surat left the patio, walked past Defendant Klamser toward Waltz, grabbed Waltz's arm, and tried to walk away with Waltz. She took only a few steps before Pastor stopped Waltz, and Defendant Klamser stopped Ms. Surat. Defendant Klamser told Ms. Surat that Waltz was not free to go, "but you can keep walking."

19. Concerned for her boyfriend, Ms. Surat stayed outside of the bar on the sidewalk and was several feet away from Waltz when Defendant Klamser again stopped her, stood in front of her, and told her to “back off,” while pushing her right shoulder backwards with his hand.

20. Reasonably frustrated by Defendant Klamser’s aggressive confrontation and condescending push to her shoulder, Ms. Surat told him, “you don’t need to touch me.”

21. In response, Defendant Klamser grabbed Ms. Surat’s wrist. Frustrated by Defendant Klamser’s painful and unnecessary restraint of her wrist and arm, Ms. Surat told Defendant Klamser, “you don’t need to fucking touch me,” as she attempted to free herself from his grasp.

22. Defendant Klamser, still holding Ms. Surat’s wrist, pulled her arm behind her back and placed her in a rear wristlock hold.

23. Still grabbing Ms. Surat’s wrist, Defendant Klamser demanded that Ms. Surat put her free hand up on her head. Simultaneously, Ms. Surat repeatedly asked Defendant Klamser why he was touching her. He responded that she was under arrest without giving any other explanation.

24. Speaking over one another, Ms. Surat again asked Defendant Klamser what she did and why he was touching her, and he again told her that she was under arrest. She asked Defendant Klamser, “can you explain to me why you’re arresting me? What did I do?” This exchange continued for another several seconds. Defendant Klamser did not respond.

25. Defendant Klamser then said to Ms. Surat, “I don’t want to throw you on the ground.”

26. Defendant Klamser continued to force Ms. Surat’s wrist in a rear wrist control hold and Ms. Surat, again, distressed and confused by the situation, asked Defendant Klamser

what she did wrong.

27. In response to Ms. Surat's perceived resistance through her simple questioning of Defendant Klamser, Defendant Klamser, still holding Ms. Surat's wrist, violently pulled Ms. Surat's arm and forcefully threw her face-down to the ground.

28. Ms. Surat's chin slammed into the sidewalk, causing a concussion, cervical spine strain, and a large and painful contusion that later turned purple and black. She sustained other painful bruising on both of her arms, wrists, knees, and legs.

29. The entire encounter between Ms. Surat and Defendant Klamser happened in thirty-two seconds.

30. Defendant Klamser intended to harm Ms. Surat when he violently threw her to the ground to arrest her. Defendant Klamser is six feet tall and 203 pounds, which is much larger than Ms. Surat's 115-pound frame.

31. A reasonable person in Ms. Surat's place would have believed that she was not free to leave from the moment Defendant Klamser grabbed her wrist and refused to let go.

32. Defendant Klamser did not have a reason to believe that Ms. Surat had any weapon and Ms. Surat posed no threat whatsoever to the officers.

33. Ms. Surat was also humiliated during this experience. During Defendant Klamser's violent take-down of Ms. Surat, her dress rose above her hips and her lower buttocks and underwear were exposed. She remained face-down in this position while she was handcuffed by Pastor. Defendant Klamser was aware that Ms. Surat's lower buttocks were exposed, as they were uncovered and entirely visible in his bodycam footage during Ms. Surat's handcuffing.

34. Ms. Surat was forcefully lifted to her feet by Defendant Klamser and Pastor. One of the officers partially attempted to fix her dress, but it was not pulled down enough and she was paraded through Old Town Square with part of her lower buttocks still exposed.

35. While Defendant Klamser walked with Ms. Surat toward a backup patrol vehicle, Ms. Surat, sobbing, asked other passersby for help. Ms. Surat then collapsed to the ground, and while still sobbing in extreme distress, she told Defendant Klamser that he was hurting her. She soon mustered the strength to get back on her feet, and she pleaded with individuals walking down the street to help her and to help pull her dress down because her dress was again at her hips. Several seconds later, a young woman helped Ms. Surat by pulling the skirt of her dress down.

36. Additional FCPS officers arrived at the scene, and Ms. Surat spoke with them about the incident while handcuffed in the patrol car. Ms. Surat was extremely distressed as she spoke with the officers.

37. Ms. Surat requested paramedic help for her injuries.

38. Ms. Surat proceeded through a misdemeanor jury trial in Ft. Collins on August 20-24, 2018. She was convicted of C.R.S. § 18-8-103 (Resisting Arrest) and C.R.S. § 18-8-104(1)(a) (Obstructing a Peace Officer) and sentenced to 12 months of supervised probation, 48 hours of community service, alcohol evaluation and treatment, monitored sobriety, and a Making Better Choices class.

### *B. Ms. Surat was evaluated by physicians at UCHealth and was diagnosed with cervical strain and several contusions all over her body. She suffered lasting physical and mental/emotional injuries.*

39. On the night of April 6, 2017, and into the morning of April 7, 2017, Ms. Surat was examined by Ken Philbeck, MD in the PVH Emergency Department at UCHealth. Dr.

Philbeck diagnosed her with “contusion of head, unspecified part of head.”

40. Ms. Surat was then examined by Nicole Niemann, MD and Mollie Wolf, Physician Assistant, Certified (PAC) in the PVH Emergency Department at UCHealth. Dr. Niemann’s diagnoses were contusion to other part of head, contusion of left forearm, contusion of right forearm, and contusion of left wrist. Dr. Wolf’s physical exam showed a two centimeter in diameter ecchymotic area to her chin. Ms. Surat reported that she was in continual pain.

41. Later that day, Ms. Surat was examined by doctors Thomas Fralich, MD, Keasha Kuhnen, DO, and Mollie Wolf, PAC at UCHealth in the PVH Emergency Department for her chin contusion. She was given recommendations on how to care for her contusion and instructed to return for a follow-up appointment in several days.

42. By April 8, 2017, Ms. Surat’s chin contusion had grown and become purple and black.

43. On April 11, 2017, Ms. Surat was evaluated by Dr. Julie Devita-Bailey, DO at UCHealth. Dr. Devita-Bailey noted that Ms. Surat presented with “Injury” and “Concussion.” Ms. Surat was suffering from left hand pain and numbness, trouble focusing and thinking, headaches, and jaw, neck, and back pain. Dr. Devita-Bailey’s physical exam showed that she had decreased cervical spine lordosis and tenderness with palpation of her left lateral neck. She also had mild to moderate spams of her neck and trapezius muscles (back of neck to top of back) bilaterally. Dr. Devita-Bailey referred Ms. Surat to the Emergency Room for an evaluation for her neck pain and headaches.

44. Ms. Surat was then seen by Dr. Travis Brown, DO at the UCHealth Emergency Room. She was diagnosed with “acute cervical strain” and “chin contusion.” She was given pain relief medication during her visit and prescribed Flexeril to alleviate muscle spasms.

45. Ms. Surat had trouble chewing and opening her mouth all the way for approximately five or six months afterward. The bruises on her arms and legs continued to hurt for several weeks, and her neck was sore and difficult to move for several days. She was still confused and dizzy at times due to the head injury.

46. Ms. Surat also suffered mental and emotional harm from the incident. She received so many death threats and nasty comments online that she deactivated her social media accounts and avoided leaving her house for a while. To this day, people on the street still recognize her from the video, which went viral.

### *C. Defendant Fort Collins' policies, customs and practices of conducting unlawful seizures and using excessive force were moving forces behind the violations of Ms. Surat's constitutional rights.*

47. Defendant Klamser's treatment of Ms. Surat was pursuant to Defendant Fort Collins' custom, policy and/or practice of: (1) its officers responding to even the mildest resistance, or perceived resistance, with excessive force and (2) failing, in the face of obvious excessive force in response to perceived resistance, to find officers engaged in wrongdoing and to discipline officers.

48. In this case, Defendant Fort Collins found that Defendant Klamser's use of force in response to Ms. Surat's initial resistance was in accordance with Defendant Fort Collins' custom, policy, and practice. Specifically, Defendant Fort Collins, in a review conducted by Officer Al Brown, who is FCPS' Senior Lead Defensive Tactics Instructor, found that Officer Klamser responded to Ms. Surat's resistance with an agency approved technique. In other words, Officer Klamser's full takedown of Ms. Surat, which was done in response to her perceived resistance, was done in accordance with Defendant Fort Collins' customs, policies, and practices.

Officer Klamser was not disciplined for his use of force in response to Ms. Surat's perceived resistance.

49. Defendant Fort Collins' failure to find wrongdoing and failure to discipline officers in this case and in the cases described below reflects a custom, policy or practice of ratifying blatantly illegal and improper conduct. These ratifications evidence that such police conduct is carried out pursuant to the regimen of training provided by Defendant Fort Collins, and that such conduct is customary within Defendant Fort Collins' Police Department.

50. It is Defendant Fort Collins' responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify, their improper conduct, so that officers can learn from their mistakes and perform their jobs correctly moving forward. Defendant Fort Collins' failure to do so has led to its officers' unconstitutional conduct, and will lead to more unconstitutional conduct in the future.

51. The FCPS internal affairs investigation concluded that Defendant Klamser acted lawfully and in accordance with FCPS policy. Because Defendant Klamser failed to institute any number of options of lesser uses of force to address Ms. Surat's perceived resistance, the reasonable inference is that the city condones excessive force like that of Officer Klamser's rowing arm takedown under the circumstances, and that the City's policy and training lead officers to act unconstitutionally.

52. Additionally, in response to the incident involving Ms. Surat, FCPS spokesperson Kate Kimble told the media that Defendant Klamser used "standard arrest control," which indicates a custom and practice of unconstitutional use of force.

53. Defendant Klamser stated in a deposition in this matter, under oath, that the actions he took with respect to Ms. Surat, including his use of force in response to Ms. Surat's

perceived resistance, were in accordance with the training he was given by Defendant Fort Collins and Defendant Fort Collins' customs, policies, and practices.

54. Furthermore, Defendant Fort Collins has a responsibility to properly train and supervise its law enforcement officers in complying with constitutional requirements during encounters with citizens, and to discipline officers that violate such constitutional requirements.

55. FCPS has been involved in several high-profile excessive force cases. In December of 2013, FCPS officers similarly brutalized Stanley Cropp, an sixty-year-old man with Alzheimer's disease and dementia. Mr. Cropp was tackled and apprehended by FCPS officers while taking a walk in his neighborhood before bed. FCPS officers alleged that they used further force against Mr. Cropp, after they tackled him, because he resisted their arrest. The force the officer used to end Mr. Cropp's alleged resistance was excessive. Despite this, on information and belief, the FCPS officers were not disciplined for their use of excessive force or otherwise reprimanded.

56. Only a few months before FCPS officers wrongfully seized and used excessive force against Ms. Surat, other FCPS officers similarly and unreasonably used excessive force against other members in the community in response to the alleged resistance of those other individuals.

57. On October 20, 2016, a FCPS officer used excessive force against Dakota McGrath. Mr. McGrath was suspected of third-degree assault and approached by a Fort Collins police officer while he was in his vehicle. The officer directed Mr. McGrath to stop what he was doing and to come speak with the officer. However, Mr. McGrath walked away from the officer down an alley and indicated to the officer that he would not comply. The officer then struck Mr. McGrath with his baton, knocking Mr. McGrath to the ground. The officer gave Mr. McGrath a

number of further commands, which Mr. McGrath did not comply with. To end Mr. McGrath's noncompliance, the officer struck Mr. McGrath in the leg multiple times with his baton, fracturing his leg in several places. The force the officer used to end Mr. McGrath's resistance was excessive. Despite this, on information and belief, the officer was not disciplined for his use of excessive force or otherwise reprimanded.

58. In July of 2016, FCPS officer responded to Enan Joe Heneghan's house for a noise complaint. Mr. Heneghan complied and turned down the music. The officer proceeded to search Mr. Heneghan's home without a warrant and without his consent. The FCPS officer asked Mr. Heneghan to give his identification. When Mr. Heneghan refused, the officer told him that he was resisting arrest and responded to that alleged resistance by pepper spraying him twice in the face. The force the officer used to end Mr. Heneghan's alleged resistance was excessive. Despite this, on information and belief, the officer was not disciplined for his use of excessive force or otherwise reprimanded.

59. On October 6, 2017, Kimberly Chancellor was driving when she noticed that a man on a motorcycle was following her. That man was a FCPS officer. He continued following her as she pulled into the parking lot of her apartment complex. She hurried toward the building to get away from him. When the man yelled that he was a FCPS officer and she was going to be arrested, she hesitated and stopped even though he still had not proven that he was an officer. After Ms. Chancellor handed the officer her identification, he put his hand on her and she pulled away. In response to this resistance, the FCPS officer slammed Ms. Chancellor to the ground, put his knee in her back, and held her head to the ground. The force the officer used to end Ms. Chancellor's resistance was excessive.

60. FCPS officers used excessive force in a recent egregious incident against Natasha Patnode, a woman who shoplifted at a Target store on March 29, 2018. Ms. Patnode was held to the ground by a number of FCPS officers, but had her arm under her body. The FCPS officers repeatedly yelled at Ms. Patnode to stop resisting and give them her arm. She did not. In response to this perceived resistance, an FCPS officer repeatedly punched and beat Ms. Patnode with a baton. Another FCPS officer tased Ms. Patnode multiple. the ground. The force the officer used to end Ms. Chancellor's perceived resistance was excessive. Despite this, on information and belief, the officer was not disciplined for his use of excessive force or otherwise reprimanded.

61. On December 3, 2016, Sean Slatton was attending his girlfriend's sorority formal when he was ejected from the event. An FCPS officer ordered Mr. Slatton to leave, and Mr. Slatton calmly and immediately complied. Mr. Slatton stood outside the building and ordered a ride service to take him back to his hotel. Two FCPS officers followed Mr. Slatton outside and demanded he leave the premises. Mr. Slatton explained that he was waiting for his ride. After again demanding Mr. Slatton leave the property, on FCPS officer demanded to see Mr. Slatton's identification. Mr. Slatton objected and walked away. In response to this perceived resistance, the FCPS officer told Mr. Slatton he was under arrest, and immediately struck Mr. Slatton in the leg with a baton and pepper sprayed him in the face. The force the officer used to end Mr. Slatton's perceived resistance was excessive. Despite this, on information and belief, the officer was not disciplined for his use of excessive force or otherwise reprimanded.

62. Despite having notice that their policies, practices, customs, and insufficient training and supervision led to unconstitutional police conduct, Defendant Fort Collins continuously failed to provide adequate training to FCPS officers on complying with the

requirements of the Fourth Amendment, including that responding to even the mildest resistance, or perceived resistance, with excessive force violates the Fourth Amendment.

63. Defendants' unlawful conduct, as set forth in detail herein, amounts to a custom and widespread practice, even if not authorized by written law or express municipal policy, so pervasive and well-established as to constitute a custom or usage with the force of law.

64. Had Defendant Fort Collins implemented different training policy on the Fourth Amendment, including that responding to even the mildest resistance, or perceived resistance, with excessive force violates the Fourth Amendment, the officers would not have subjected Ms. Surat to the constitutional violations described herein. Thus, the Defendant Officers' illegal conduct was caused by Defendant Fort Collins' failure in its direction to and training of FCPS officers.

65. Defendant Fort Collins knew, or had constructive knowledge, that its employees would respond to even the mildest resistance, or perceived resistance, with excessive force, which violates the Fourth Amendment.

66. Defendant Fort Collins was deliberately indifferent to Plaintiff's constitutional rights, because Fort Collins knew that individuals in Plaintiff's position would be at a substantial risk of suffering dangerous consequences from Fort Collins' failure to properly train and supervise its employees.

67. Defendant Fort Collins could have and should have pursued reasonable methods for the training and supervising of such employees, but intentionally chose not to do so.

68. Defendant Fort Collins' policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of Defendants' violation of Plaintiff's constitutional rights.

69. All of the acts described herein were done by the Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Ms. Surat's federally protected rights, and were done pursuant to the preexisting, deliberately indifferent official custom, policy, practice, training, and supervision.

70. It is the longstanding widespread deliberately indifferent custom, habit, practice and/or policy of Defendant Fort Collins to fail to supervise and to train officers in the rights of citizens to be free from unreasonable seizure and excessive force.

### *D. Defendant Fort Collins' training on when it is appropriate to use the "rowing arm takedown" technique caused the violation of Ms. Surat's constitutional rights.*

71. Police officers throughout the United States are taught, or should be taught, to avoid striking and causing blunt trauma force to an individuals' head, neck, and /or spine, except in the most exceptional of cases where the officers may be engaged in a deadly force confrontation. It is standard police practice that officers are typically taught not to use a police baton on someone's head, neck, or spine because such trauma can cause serious bodily injury or even death. It is standard police practice that officers are taught not to punch, kick, knee strike or elbow strike someone in the head, neck, or spine, again because such trauma can cause serious bodily injury or even death. It is standard police practice that officers are taught not to use a TASER on someone who is running away due to the fact that once energized and neuro-muscular incapacitation sets in, the subject will most probably fall and injure his or head, neck, or spine, again suffering serious bodily injury or perhaps death. It is standard police practice that officers are taught not to shoot beanbag shotgun rounds or 40 mm stun rounds at someone's head or neck, again because they may sustain serious bodily injury or even death. A takedown maneuver where someone is forcefully taken to the ground where their contact with the ground

results in them striking their head and/or neck falls into the same category. There is no difference.

72. It is standard police practice that these maneuvers, sometimes referred to by police officers as, “throw downs,” “face plants,” or “head plants,” are not to be condoned, except in the most aggravated of cases where there is a deadly force confrontation occurring or about to occur.

73. Defendant Fort Collins trains its officers to use the same technique, calling it a “rowing arm takedown,” in circumstances where there is no deadly force confrontation occurring or about to occur.

74. Defendant Fort Collins does not train its officers to avoid causing injury or even serious bodily injury or death during the “rowing arm takedown” maneuver.

75. Defendant Fort Collins fully sanctions the “rowing arm takedown” maneuver and authorizes Fort Collins Police Officers to use it during physical force scenarios.

76. Defendant Fort Collins does not train its officers on how to utilize the “rowing arm takedown” maneuver in a manner where the individual taken down does not get injured, especially insofar as head, neck, and facial injuries are concerned.

77. Defendant Fort Collins does not train its officers on the significant potential of the “rowing arm takedown” maneuver to cause death or serious bodily injury.

78. Defendant Fort Collins does, however, train its officers that this maneuver is a department-sanctioned maneuver. It does so without any training on the proportionality of such force to the resistance being offered or the inherent dangers of using such a tactic.

79. Defendant Klamser used the “rowing arm takedown” on Ms. Surat, despite the fact that this use of force was excessive. Defendant Klamser was trained to do so by Defendant

Fort Collins. Defendant Fort Collins' training and supervision of Defendant Klamser, and its sanctioning of the use of the "rowing arm takedown" in instances where use of the maneuver is excessive, caused Defendant Klamser to violate Ms. Surat's constitutional right to be free from excessive force.

80. Defendant Fort Collins trained its officers to utilize the "rowing arm takedown" (without any training regarding the proportionality of such force to the resistance being offered or the inherent dangers of using such a tactic) despite knowing that such a maneuver can cause death or serious bodily injury. After Officer Klamser used the "rowing arm takedown" against Ms. Surat, his use of force was reviewed by Officer Al Brown, the FCPS Senior Lead Defensive Tactics Instructor. Officer Brown, on behalf of Defendant Fort Collins, stated that Officer Klamser's use of the "rowing arm takedown" against Ms. Surat was in accordance with Defendant Fort Collins' training.

## V. STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth & Fourteenth Amendment Violation
### Excessive Force
### (Against Defendant Klamser)

81. Plaintiff hereby incorporates all other paragraphs of this First Amended Complaint as if fully set forth herein.

82. At all times relevant to the subject matter of this First Amended Complaint, Defendant Klamser was acting under color of state law in his capacity as an FCPS officer and within the scope of his employment.

83. At the time when Ms. Surat was seized, she had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in her person from unreasonable seizure through excessive force.

84. Any reasonable law enforcement officer knew or should have known of this clearly established right.

85. Ms. Surat's resistance and obstruction were minor offenses that did not justify Defendant Klamser's rowing arm takedown of her.

86. Ms. Surat posed no immediate threat to the safety of the officers or others. Defendant Klamser's perceived resistance by Ms. Surat did not justify his violent takedown of Ms. Surat.

87. Defendant Klamser's arrest of Ms. Surat by, among other things, pulling her arm by her wrist and violently throwing her face-first to the sidewalk, used greater force than would have been reasonably necessary to effect her seizure.

88. Defendant Klamser's rowing arm takedown of Ms. Surat was objectively unreasonable under the circumstances.

89. Defendant Klamser's excessive use of force caused excruciating pain to Ms. Surat's head, chin, and neck, which required emergency medical attention. Her knees, wrists, arms and legs were painfully bruised. She also suffered physical and mental injury, including pain and suffering, humiliation, and other injuries, damages, and losses due to Defendant Klamser's actions. These injuries are not *de minimis*.

90. Defendant Klamser's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Ms. Surat's federally protected rights, which entitles Ms. Surat to punitive damages.

91. Defendant Klamser used excessive force in accordance with custom, policy, practice, and training provided and promulgated by Defendant Fort Collins.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 –**

**Fourth & Fourteenth Amendment Violation**
**Excessive Force – Unconstitutional Policies, Customs, and Practices**
**(Against Defendant City of Fort Collins)**

92. Plaintiff hereby incorporates all other paragraphs of this First Amended Complaint as if fully set forth herein.

93. Defendant Fort Collins established policies, customs and/or practices in violation of the Constitution.

94. Defendant Fort Collins developed and maintained law enforcement-related policies, customs, and/or practices exhibiting or resulting in a deliberate indifference to the Fourth and Fourteenth Amendment protected constitutional rights of persons in Fort Collins, which proximately caused the violation of Ms. Surat's constitutional rights.

95. Defendant Fort Collins failed to properly train and supervise its employees with regard to lawful seizures and lawful use of force.

96. Defendant Fort Collins has a duty to protect the constitutional rights of the members of the public from violations of those rights by members of their police department.

97. In light of the duties and responsibilities of those law enforcement officers that participate in providing safety and security for citizens and arrestees, the need for specialized training and supervision is so obvious, and the inadequacy of training and supervision is so likely to result in the violation of constitutional rights such as those described herein, that Defendant Fort Collins is liable for its failure to do so.

98. The inadequate training and supervision provided by Defendant Fort Collins resulted from a conscious or deliberate choice to follow a course of action from among various alternatives. Defendant Fort Collins could have and should have pursued reasonable methods for the training and supervising of such employees, yet failed to do so.

99. Defendant Fort Collins' policies, customs, or practices in failing to train and supervise its employees were the proximate cause of, and moving force behind, the violation of Ms. Surat's constitutional rights, which caused her damages as set forth above.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and grant:

(a) Appropriate declaratory and other injunctive and/or equitable relief;

(b) Compensatory and consequential damages, including damages for physical injury, emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c) All economic losses on all claims allowed by law;

(d) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e) Attorney's fees and the costs associated with this action, as well as expert witness fees, on all claims allowed by law;

(f) Pre- and post-judgment interest at the lawful rate to the maximum extent allowed by law; and

(g) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 24th day of August 2020.

KILLMER, LANE & NEWMAN, LLP

/s/ *Andy McNulty*___________

David Lane
Andy McNulty
Helen Oh
1543 Champa Street, Suite 400
Denver, Colorado 80202
Tel: (303) 571-1000
Fax: (303) 571-1001
dlane@kln-law.com

amcnulty@kln-law.com
hoh@kln-law.com

*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I certify that on this 24th day of August, 2020 I filed a true and correct copy of the foregoing AMENDED COMPLAINT via CM/ECF which will generate emailed notice to the following:

Mark Ratner
Brenden Desmond
Hall & Evans, LLC
1001 Seventeenth Street, Ste 300
Denver, CO 80202
303-628-3492
ratnerm@hallevans.com
desmondb@hallevans.com
*Counsel for Defendants*

*s/ Jamie Akard*______
Jamie Akard