**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-00901-NRN

MICHAELLA LYNN SURAT,

      Plaintiff,

v.

RANDALL KLAMSER, in his individual capacity, and
CITY OF FORT COLLINS, a municipality,

      Defendants.

---

**PLAINTIFF'S CONSOLIDIATED RESPONSE TO DEFENDANTS' MOTION TO
DISMISS FIRST AMENDED COMPLAINT AND MOTION FOR SUMMARY
JUDGMENT [DOCS. 108 & 118]**

---

Plaintiff, by and through her undersigned counsel of record, hereby submit the following

Consolidated Response to Defendants' Motion to Dismiss and Motion for Summary Judgment

[Docs. 108 and 118], and state as follows:

## **INTRODUCTION**

This is a case of excessive and unreasonable use of force by Defendant Officer Randall

Klamser against Plaintiff Michaella Surat who, at the time of the incident in question, was a

student at Colorado State University out at Bondi Beach Bar celebrating her twenty-second

birthday with her then-boyfriend Mitchell Waltz and a few of their friends.

Fort Collins Police Services ("FCPS") Officers Defendant Klamser and Garrett Pastor

were called to the bar to investigate an altercation that involved Mr. Waltz. The altercation

dissipated the time they arrived, and Waltz stood on the sidewalk outside the bar as Ms. Surat

stood outside on the bar patio. In order to be with Mr. Waltz, Ms. Surat, wearing a dress and high

heels, walked past Defendant Klamser, grabbed Waltz' hand and began walking away. Klamser

stopped Ms. Surat and told her that Waltz was not free to go, but that she could keep walking. Concerned for her boyfriend, Ms. Surat stayed in place. Klamser immediately told her to back off while pushing her shoulder backwards. Ms. Surat repeatedly told Klamser, "you don't need to touch me." Klamser quickly placed Surat in a rear wristlock hold and told her she was under arrest, which confused Surat. She repeatedly asked Klamser why he was arresting her, and received no response. Frightened by Klamer's restraint of her wrist and his refusal to explain the reason for her arrest, Surat continued to ask what she had done wrong and did not comply with Klamser's lawful orders.

Despite being twice Ms. Surat's size, knowing that she was clearly unarmed, posed little to no immediate threat to the officers or others, and having numerous other reasonable and proportionate methods of overcoming her resistance, Klamser effected Surat's arrest by violently throwing her face-first on the concrete. In extreme pain, shock, and horror, Surat was arrested while prone on her stomach with her dress now lifted above her hips, exposing her buttocks to the officers and dozens of bar patrons standing nearby in the bar entrance line. A bystander video of this shocking use of force went internationally viral. She sustained a concussion, cervical strain, and large contusions to her chin, arms, knees, legs. Considering the misdemeanor offenses Surat committed, the minimal threat she presented to the officers and others, and her low-level resistance, Defendant Klamser's takedown of Ms. Surat was highly excessive and disproportionate under the circumstances and violated Ms. Surat's Fourth Amendment rights.

## **PROCEDURAL POSTURE**

Plaintiff filed her initial Complaint and Jury Demand on March 26, 2019 alleging excessive force under the Fourth Amendment against Defendant Klamser, and unconstitutional customs, policies, and practices against Defendant City of Fort Collins ("Fort Collins"). [Doc. 1].

On June 7, 2019, Defendants filed a motion to dismiss, arguing Plaintiff's excessive force claim was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) and that the claim against Fort Collins should fail because there was no underlying constitutional violation. [Doc. 23].

On February 24, 2020, the Court issued its Order granting in part and denying in part Defendants' motion to dismiss. [Doc. 84]. In light of *Heck* and Surat's convictions for resisting arrest and obstruction, the Court granted Defendants' motion as to any claim of excessive force that happened before Klamser's takedown, while finding that *Heck* did not bar a claim alleging that the takedown itself constituted excessive force, thus denying Defendants' motion as applied to the takedown. *Id.* at 14 ("as pleaded, a finding by the jury that Klamser's takedown was more forceful than necessary under the circumstances would not 'necessarily imply the invalidity,' *Heck*, 512 U.S. at 487, of Surat's convictions."). The Court also dismissed Plaintiff's *Monell* claim against Fort Collins without prejudice.

On August 24, 2020, after the Court granted leave for Plaintiff to file an amended complaint, Plaintiff filed her First Amended Complaint and Jury Demand ("FAC")[1] with additional *Monell* allegations against Defendant Fort Collins. [Doc. 107]. On September 14, 2020 Defendants filed a motion to dismiss Plaintiff's FAC (hereinafter "Motion to Dismiss"). [Doc. 108]. On October 13, 2020, while Plaintiff's response to Defendants' Motion to Dismiss was still pending, Defendants filed a motion for summary judgment. [Doc. 118]. Defendants argue the same bases for judgment in their favor in their Motion to Dismiss and motion for summary judgment. In both motions, Defendants argue: (1) Plaintiff's excessive force claim

---

[1] On October 29, 2019, Larimer County Court affirmed Ms. Surat's convictions on appeal. *See* ECF 55-1. As the court's ruling came after Plaintiff's FAC, in accordance with *Heck*, Plaintiff seeks to strike two parts of the allegations in her FAC that are inconsistent with her underlying convictions. In FAC ¶21, Plaintiff seeks to strike the word "unnecessary." In ¶27, Plaintiff seeks to strike the word "perceived."

against Defendant Klamser is barred by qualified immunity because she cannot meet either prong of the qualified immunity test, and (2) Plaintiff's *Monell* claim against Defendant Fort Collins should be dismissed because Plaintiff's FAC fails to sufficiently allege municipal liability. In fact, aside from the Statement of Material Facts, Defendants' summary judgment motion is nearly identical in substance to that of their Motion to Dismiss.

In the interest of judicial economy and efficiency of the parties, the Court granted Plaintiff's motion to file a consolidated response to Defendants' Motion to Dismiss and motion for summary judgment on October 24, 2020. [Doc. 124]. The Court has wide discretion in deciding whether to convert a motion to dismiss into a motion for summary judgment. *Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999). In light of this being a consolidated response where the Court will consider a much broader range of evidence in deciding the summary judgment motion, the motion to dismiss standard is easier for a plaintiff to withstand than that for summary judgment, Defendants' summary judgment motion is nearly identical to their Motion to Dismiss, and to avoid duplicitous arguments and analyses, the Court should consider both of Defendants' motions as a single motion for summary judgment, and Plaintiff will analyze her response under the more stringent summary judgment standard.

## Response to Movant's Material Facts ("RMMF")

1-4. Admit.

5-8. **Admit in part**. Admit these are the general responsibilities of contact and cover officers. Deny any implication that these roles prevented Defendant Klamser from reasonably asking Officer Pastor for assistance in effectuating Ms. Surat's arrest. *See* **Ex. 1,** *Deposition of Garrett Pastor*, 27:17-23 (stating that had Klamser asked him for a hand with arresting Ms. Surat, he "would have probably given him a hand").

4

9. Admit.

10. **Deny.** Ms. Surat was not yelling, she was trying to talk with Waltz as he was a little further out from her on the sidewalk while she stood on the patio. Defs. Ex. B, at 00:38-00:45. Officer Pastor was not talking to Waltz as Ms. Surat was talking to Waltz. *See* **Ex. 2,** *Deposition of Michaella Surat*, 135:5-21; Defs. Ex. I, at 1:00-1:13.

11. **Deny in part.** Surat did not physically bump into Klamser. *See **Ex. 2,*** 137:23-138:7; Defs. Ex. B, at 00:48-:51; Defs. Ex. I, at 1:12-1:17. Even the bouncer, Cory Esslinger explained that it seemed like Ms. Surat was trying to walk past him and Defendant Klamser but "Officer Klamser and I were definitely taking up the majority of the doorway there." *See* **Ex. 3,** *Deposition of Cory Esslinger*, 27:22-28:1.

12-13. **Deny in part**. Admit Movants' Statement of Material Facts ("MSMF") ¶12, however, taken with MSMF ¶13, the sequence in which this occurred is incorrect. Before Klamser "yelled to Officer Pastor that Waltz was not free to go," MSMF ¶12, Ms. Surat walked past Klamser to be with Waltz and began to walk away with Waltz, which is what precipitated Klamser's statement. Defs. Ex. B, at 00:40-:56. **Deny** that Ms. Surat tried to pull Waltz away from Pastor; she was attempting to walk away with Waltz. *See* **Ex. 2**, 141:2-12; *see also* Defs. Ex. B, at :55-1:00; Defs. Ex. I, at 1:15-1:21.

14-17. Admit.

18. **Deny.** The crowd was not reacting to what was happening. *See* Defs. Exs. B and I. The crowd reacted when Ms. Surat was thrown to the ground by Defendant Klamser. *See* Defs. Ex. I, at 1:50-2:03; Defs. Ex. B, at 1:29-1:35; **Ex. 4**, *Barstool CSU Video*.

19-20. Admit.

21-22. **<u>Deny.</u>** Surat did not "walk through" Klamser. Surat was stopped by Klamser who immediately became physical and told Ms. Surat to "back off" while pushing her shoulder backwards with his hand. *See* FAC ¶¶19-20; Defs. Ex. B, at 00:58-1:08. In response to Klamser pushing and then grabbing her, Ms. Surat stated, "you don't need to touch me." *Id.* As Surat made this statement, Klamser grabbed Surat's wrist and arm and pulled her arm behind her back, placing her into a rear wristlock hold. *See* Defs. Ex. B, at 1:06. Surat quickly reacted by again telling Klamser that he did not need to touch her. *Id.*

23. **<u>Deny</u>**. Surat was not belligerent and abusive toward Klamser. *See* Defs. Ex. B. She was frustrated by Klamser's aggressive physical confrontation and continued pushing and grabbing of her as she repeatedly stated that he did not need to touch her. *See id.* at 1:00-1:10. When Klamser told Surat she was under arrest, she was distressed and confused by the situation and repeatedly asked Klamser why he was arresting her. *Id.* at 1:10-1:25. Her questions were ignored.[2] *Id.*

24. **<u>Deny</u>**. Surat was not trying to walk through Klamser, nor did she ever slap or hit Klamser at any point during their encounter. *See* **Ex. 5,** *30(b)(6) Deposition of Deputy Chief Greg Yeager*,[3] 40:5-11; *see also* **Ex. 2**, 145:7-13; Defs. Ex. B, at 1:00-1:30.

25. **<u>Deny</u>**. Surat never put her hands around Klamser's throat. **Ex. 2**, 145:14-16; **Ex. 5**, 39:25-40:4; Defs. Ex. B, at 1:00-1:30; **Ex. 4.**

---

[2] Despite Ms. Surat's frustrations, she was indeed resisting arrest and she is not challenging her convictions for resisting or obstruction. These facts demonstrate the circumstances for which the jury may assess the *degree* to which Ms. Surat was resisting and obstructing, which was not an element of her offenses. *See* SADF ¶¶2-3.

[3] As the Deputy Chief of Police, Officer Yeager sat on the review of every investigation that would lead to significant discipline. **Ex. 5**, 12:6-11. Prior to his role as Deputy Chief, Yeager served in various supervisory roles within the Internal Affairs Bureau ("IAB") as Assistant Chief, Professional Standards Lieutenant, and IA Sergeant.

26. Admit.

27. **<u>Deny.</u>** *See* RMMF ¶¶5-8. Klamser could have requested the assistance of a supervisor or another officer. *See* **Ex. 6,** *Montgomery Report*, p. 7; *see also* **Ex. 1,** 27:17-23. Nonetheless, should Surat have escaped, there would have been no risk of harm to Klamser or others. *See* **Ex. 5**, 49:20-50:23.

28. Admit in part. Klamser had control of Ms. Surat's wrist. **Ex. 7,** *Deposition of Randall Klamser*, 69:24-70:1 ("Q: You had her by her wrist very firmly, did you not? A: Yes.").

29. **<u>Deny.</u>** Surat never hit Klamser. *See* **Ex. 5**, 40:5-11; *see also* **Ex. 2**, 145:7-13; **Ex. 6**, p. 15; Defs. Ex. B, at 1:10-1:30. Based on the body camera footage, a reasonable jury can find that Surat never hit, scratched, slapped, or attempted to choke Klamser. *See id.*

30-31. Admit.

32. Admit. While highly prudent but not required under the law, informing Surat of why she was being arrested may have increased the likelihood of her cooperation. *See* **Ex. 2**, 149:22-150:3.

33. **<u>Deny.</u>** Plaintiff never hit Klamser. *See* RMMF ¶¶24-25, 29. Surat's misdemeanor crimes were not serious and she did not pose an immediate threat to the officers or others. SADF ¶34. Considering her resistance in light of these factors, Klamser's takedown of Surat was not at all proportional to the resistance she displayed. **Ex. 6**, pp. 9-12.

34. Admit that this is what Klamser believed. **<u>Deny</u>** that it was correct. Klamser's use of other lesser uses of force which did not subdue Surat, Klamser had a number of other uses of force available to him to reasonably effect Surat's arrest that would have been reasonable means for overcoming Surat's resistance. *See* **Ex. 5**, 76:13-24; **Ex. 6**, p. 7. He could have used an escort technique to move Surat away or various forms of lock techniques or pain compliance techniques. **Ex. 5**, 61:10-23, 62:14-28, 63:5-64:7, 69:3-16; **Ex. 1**, 49:16-25. He also could have

transitioned to a rear-wrist takedown, asked Officer Pastor for assistance, or simply disengaged.

*See* **Ex. 1***,* 15:9-16:24, 27:17-28:5. According to Dan Montgomery, Plaintiff's use of force expert

with over forty-seven years of experience in policing, at the time of the takedown, Klamser had

control of Surat's hand, and considering she was in high heels, he could have stepped towards

her and tripped one feet to take her down to the ground, which would have been a "fundamental

and simple tactic to deploy." **Ex. 8,** *Deposition of Dan Montgomery*, 60:21-61:19 (describing

other tactics and explaining that Klamser "essentially deployed an atom bomb in this case, rather

than deploying alternative uses of force. . . . There were obvious choices that were available. He

chose not to use those.").

35. **<u>Deny.</u>** The rowing-arm takedown, known to Mr. Montgomery as a "face plant" is a defensive

tactic. **Ex. 8***,* 50:14-16, 51:11-16. As a defensive tactic, the rowing-arm takedown may be

appropriate where the officer is defending himself after being attacked or there is an imminent

attack pending from a credible source. *See* **Ex. 8***,* 51:17-23. Defendants' 30(b)(6) deponent,

Deputy Chief Yeager described the purpose of the rowing-arm takedown as bringing a suspect to

the ground and into the prone position. **Ex. 5**, 67:3-10.

36. **<u>Deny.</u>** Surat never struck or attempted to strike Klamser. *See* RMMF ¶¶24-5, 29, 33, 40.

37. **<u>Deny.</u>** Surat did not try to break free, her immediate reaction was to reposition herself so as

to not be humiliated as she lay prone on her stomach in a short dress that had risen above her

hips, exposing her buttocks to the crowd of people standing outside Bondi Beach Bar. *See* Defs.

Ex. B, at 1:30-1:45 (showing Surat's clearly exposed bottom); FAC ¶33. After being handcuffed,

Surat was able to move into a kneeling position to cover herself and protect her own dignity. *See*

**Ex. 9,** Barstool Video and Klamser BWC Takedown Slow Motion; Defs. Ex. B, at 1:48. In

response to Pastor telling Surat to stop resisting,[4] Surat stated while sobbing, "I'm not resisting."
*See* Defs. Ex. B, at 1:55-2:05. Surat was forcefully lifted to her feet by Klamser and Pastor, and
Klamser partially attempted to pull down her dress, however it was not pulled down enough, and
Surat was paraded through Old Town Square with part of her lower buttocks still exposed. *See*
**Ex. 2**, 170:22-171:12; FAC ¶34;

38-39. Admit. While walking through the town to the police vehicle, Surat collapsed to the
ground because she was in pain. *See* **Ex. 2**, 172:23-173:5. When she collapsed, she sobbed in
extreme distress and pleaded with Officer Klamser, "please, you're hurting me, you're hurting
me." *See* Defs. Ex. B, at 2:35-2:50; FAC ¶35. When Surat said "fuck you!" to Klamser, she was
highly upset that Klamser slammed her to the ground, and was "now … asking me if I need
EMS." **Ex. 2**, 179:3-9.

40. Admit this is what Mr. Findlay told Klamser. **Deny** that it is true. For one, Surat never hit
Klamser. *See* RMMF ¶¶24-5, 29, 33, 36, 40; SADF ¶¶4-5. Moreover, Findlay, one of
Defendants' key witnesses, demonstrably lacks credibility. *See* SADF ¶¶70-3. A jury may
reasonably find that Findlay gave conflicting and exaggerated testimony. *Compare* **Ex. 10**,
*Deposition of Michael Findlay*, 28:10-14, 29:9-10 (describing Ms. Surat as appearing as if she
"could have fallen by herself" without much force used by Klamser, and then testifying that
"some force could have been used. I didn't see it"), *with* **Ex. 7**, 36:5-9 (affirming that it took a lot
of force to take Ms. Surat to the ground). Not only does the body camera footage disprove many
of Findlay's statements, but significant jury questions exist regarding his credibility.

---

[4] Officer Pastor testified that when using force on someone, he was trained to shout, "stop
resisting, stop resisting." **Ex. 1**, 51:9-18. As such, a jury may reasonably find that these
statements do not accurately reflect whether and to what degree Ms. Surat resisted after she was
thrown to the ground.

41-42. **Deny**. Nowhere in any body camera footage produced by Defendants can Plaintiff be seen trying to run away from Officer Mast. This is likewise the case regarding Surat's purported uncooperativeness with hospital staff.

43-44. Admit.

45. **Deny**. At the time of the takedown, Klamser failed to consider alternative, reasonable options that would not have resulted in the use of excessive force. *See* RMMF ¶34.

46. Admit. However, in this instance, the takedown Klamser used on Surat to overcome her resistance despite not committing a serious crime, posing no immediate threat to the safety of Klamser or others, her low level flight risk, and her low-level resistance was unreasonable and excessive. **Ex. 6**, p. 9.

## Statement Of Additional Disputed Facts ("SADF")

1. Obstruction and resisting arrest are minor, misdemeanor crimes. *See* C.R.S. § 18-8-103(1) and § 18-8-104(1)(a); **Ex. 5***, 32:15-18; Pastor 45:14-16; **Ex. 6***, p. 9.

2. In Surat's criminal trial, the relevant jury instructions given for the crime of resisting arrest[5] were that Ms. Surat: "(4) prevented or attempted to prevent a peace officer, (5) acting under color of his official authority, (6) from effecting an arrest of the defendant or another, (7) by using or threatening to use physical force or violence[,] (8) against the peace officer or another." **Ex. 11,** *Criminal Trial Jury Instructions*, p. 7.

---

[5] The resisting arrest statute, C.R.S. § 18-8-103 states that a person commits the crime of resisting arrest by "(a) [u]sing or threatening to use physical force or violence against the peace officer or another; or (b) [u]sing any other means which creates a substantial risk of causing bodily injury to the peace officer or another." C.R.S. § 18-8-103(1)(a) and (b). In Ms. Surat's criminal trial, part (b) of the resisting arrest statute was *not* included in the jury instruction for resisting arrest, therefore, Ms. Surat was convicted of resisting arrest pursuant to part (a) of the statute. *See* **Ex. 11**. As such, part (b) is irrelevant to the analysis of Plaintiff's excessive force claim.

3. In Surat's criminal trial, the relevant jury instruction given for the crime of obstructing a peace officer were that Ms. Surat: "(4) obstructed, impaired, or hindered the preservation of the peace, (5) by a peace officer, (6) acting under color of his official authority, (7) by using or threatening to use violence, force or physical interference or obstacle." **Ex. 11,** p. 8.

4. Surat never hit, scratched, dug her nails, or grabbed Klamser's neck. *See* **Ex. 5**, 39:25-40:11; **Ex. 2**, 145:7-16; **Ex. 1**, 46:8-25; Defs. Ex. B, at 1:00-1:30; **Ex. 6**, p. 15; RMMF ¶¶24-5, 29, 33, 36, 40; SADF ¶¶62-73.

5. The only time Surat put her hands on Klamser was when she tried to pry Klamser's hands off of her. *See Surat*, 162:5-9; *see also* Defs. Ex. B, at 1:00-1:30.

6. Surat's only physical resistance was turning away from Klamser and attempting to pry Klamser's hands off of her arm with her free hand.[6] **Ex. 5**, 43:23-44:23; **Ex. 1**, 46:8-25; Defs. Exs. B and I; **Ex. 4**; **Ex. 9**.

---

[6] SADF ¶¶4-6 do not imply the invalidity of Surat's convictions because they are "not a logical impossibility" with her convictions. *Sconiers v. Lockhart*, 946 F.3d 1256, 1269 (11th Cir. 2020). Surat's convictions included a finding that, in attempting to prevent her arrest she "us[ed] or threaten[ed] to use physical force or violence." SADF ¶2. For obstruction, the jury found she "us[ed] or threaten[ed] to use violence, force or physical interference or obstacle." SADF ¶3. Surat states that the only time she put her hands on Klamser was when she tried to pry his hands off of her, and likewise that her only resistance was turning away from him and trying to pry his hands off her arm. SADF ¶¶5-6. Because the jury may reasonably have found that Surat resisted and obstructed through "using physical force" when she attempted to pry Klamser's hands off of her and would not submit to his instructions, these facts do not implicate *Heck. Cf. McCann v. Nielsen*, 466 F.3d 619, 622 (7th Cir. 2006) (finding Plaintiff's statement that he was not "attempting to resist, escape or defeat an arrest … *so as to justify the use of deadly force by the defendant*" could be construed consistently with his assault and resisting arrest convictions to mean that the plaintiff did not pose a threat of violence or resist to a *degree* that would have justified the use of deadly force as a response) (emphasis in original)). Plaintiff avoids the confusion in *McCann* and does not allege that she did not resist arrest or use force to do so – indeed she admits to those acts; Plaintiff instead describes the *manner* and *degree* of her resistance and obstruction in a way that is consistent with her convictions. It is the *excessive* nature of the force used on her that forms the gravamen of the Complaint. *Compare Havens v. Johnson*, 783 F.3d 776 (10th Cir. 2015) (finding the plaintiff's excessive force claim barred by *Heck* because his version of events did not present an alternative scenario consistent with his

7. Ms. Surat was unarmed. *See* **Ex. 5**, 45:4-14; *see also* **Ex. 1**, 26:23-27:2.

8. It was clear to Klamser and Pastor that Surat was unarmed. *See* **Ex. 7**, 64:22-65:2; *see also* **Ex. 1**, 42:23-25.

9. Klamser was considerably bigger and stronger than Ms. Surat. *See* **Ex. 5**, 46:8-20; *see also* **Ex. 2**,, 148:10-16; **Ex. 6**, p. 15; **Ex. 7**, 35:20-23, 64:12-17.

10. Surat weighed roughly 115 pounds. FAC ¶14. Klamser weighed roughly 200 pounds. **Ex. 7**, 64:15-16.

11. Klamser was almost twice as big as Surat. **Ex. 2**, 148:17-18; **Ex. 7**, 64:12-21.

12. There was another officer on-scene with Klamser and multiple bouncers also nearby. *See* **Ex. 5,** 47:2-7; *see also* **Ex. 1**, 27:17-23.

13. Klamser had no reason to believe that Ms. Surat would be violent when he encountered her. *See* **Ex. 5**, 51:3-8; **Ex. 7**, 65:3-66:10 (agreeing that Surat appeared to be a college girl who was wearing clubbing clothing out for a good time in Old Town).

14. Surat was not running from Klamser. *See* **Ex. 5**, 49:16-19; *see also* Defs. Ex. B, at 1:00-1:30.

15. Klamser held Surat firmly by the wrist throughout their encounter which partially restrained Surat and greatly reduced her flight risk. **Ex. 7**, 69:24-70:1; **Ex. 1**, 27:20-23; Defs. Ex. B, at 1:05-1:30.

16. Klamser's objective was to gain control of Ms. Surat and put her on the ground to arrest her. *See* **Ex. 7**, 79:10-13.

---

attempted-assault conviction, but rather, was based upon his innocence). Furthermore, the body camera footage compellingly supports Surat's allegations that she did not hit or attack Klamser in any way and likewise impeaches Klamser's and Findlay's claims on the same. This undermines one of Defendants' main anticipated defenses at trial while also undermining Klamser's and Findlay's credibility regarding a central issue, making a grant of summary judgment especially inappropriate here. *See* SADF ¶¶62-73.

17. The situation was not so tense, uncertain, dangerous, or rapidly evolving that Klamser was forced to make a split-second judgment. *See* FAC ¶¶25-6; Defs. Ex. B.

18. Klamser knew that the amount of force he could use to effectuate an arrest was that which is necessary to get the job done and nothing more, and that going "above and beyond the level of force necessary" to accomplish the task would be excessive. **Ex. 7***, 74:21-75:6.

19. Klamser admittedly used a considerable amount of force when he slammed Surat to the ground, causing her head to strike the concrete first while her feet were in the air. **Ex. 9**, **Ex. 6**, p. 16; **Ex. 7**, 36:4-9; **Ex. 1**, 20:9-20.

20. Klamser knew that the rowing-arm takedown required a lot of force and could not be done slowly and gently. **Ex. 7***, 79:14-17.

21. Klamser's takedown caused Surat to hit the pavement hard, head-first. **Ex. 7***, 78:15-20, 79:1-9; *see generally* **Ex. 6**.

22. A traumatic brain injury is a serious bodily injury. **Ex. 5**, 96:11-97:6.

23. Ms. Surat suffered a concussion, a form of traumatic brain injury, from Klamser's takedown. *See* **Ex. 12,** *UC Health Records I* (noting Ms. Surat's "[c]oncussion due to altercation with police" and "post-concussion headache."). She sustained a large contusion on her chin, knees and arms, cervical strain, neck pain, and jaw pain from Klamser's use of force. *See* **Ex. 13,** *UC Health Records II*; *see also* **Ex. 14,** *Forensic Exam Report*. In addition, Ms. Surat had trouble chewing and opening her mouth fully for approximately five to six months after the incident. FAC ¶45. Because video footage of the incident went viral, she also received death threats and nasty comments online, which caused her mental and emotional distress. FAC ¶46.

### <u>Police Use of Force Expert Dan Montgomery: Officer Klamser's Takedown<br>Was Disproportionate and Improper Under the Circumstances</u>

24. Use of Force Expert Dan Montgomery is the retired Chief of Police of Westminster with a forty-seven-year career in policing. Twenty-five of those years were as Chief of Police. **Ex. 15,** *Dan Montgomery CV.* He was a past President of the Colorado Association of Chiefs of Police and is the owner and CEO of Professional Police and Public Safety Consulting, LLC. *Id.* Mr. Montgomery opined that "[p]olice use of force must meet the <u>test of proportionality</u>. Officer Klamser deviated from this guideline by slamming Ms. Surat to the pavement face-first and using physical force that did not meet the test of proportionality." **Ex. 6**, p. 6 (emphasis in original). Mr. Montgomery explained the reasoning for his conclusions in his report, the full content of which are incorporated by reference herein. *See* **Ex. 6.**

25. Officer Klamser failed to consider all options, including the assistance of added resources and an alternative control tactic that would not result in Ms. Surat being slammed to the pavement face-first. **Ex. 6**, p. 7; **Ex. 7**, 66:22-67:2; **Ex. 1**, 15:9-16:24, 27:17-28:5.

26. Police officers are trained on both defensive tactics and arrest-control tactics, which are two different domains. **Ex. 8**, 52:17-24; *see also* RMMF ¶35.

27. In an arrest-control situation like that of Surat, where the purpose is to gain control of a subject, and where an officer is not defending their life or safety, the rowing-arm takedown is inappropriate. **Ex. 8**, 51:24-52:4.

28. When Klamser used the rowing arm takedown on Surat, he used a defensive tactic in an arrest-control situation when he was not defending himself from an imminent threat, which was violent and improper. **Ex. 8***, 53:22-25.

29. Police officers throughout the nation are generally taught to avoid striking and causing blunt force trauma to an individuals' head, neck, and/or spine, except in the most exceptional of cases

where the officers may be engaged in a deadly force confrontation, because such trauma can cause serious bodily injury or death. **Ex. 6**, p. 11; *see also* **Ex. 7**, 35:1-19.

30. A takedown maneuver like the rowing arm takedown where someone is forcefully taken to the ground where their contact with the ground results in them striking their head and/or neck on the pavement falls into the same use of force category as shooting beanbag shotgun rounds or 40 mm stun rounds at someone's head or neck because both can cause serious bodily injury or death. **Ex. 6**, pp. 11-12.

31. When Klamser slammed Surat to the pavement face-first, he created a substantial risk of causing death or serious bodily injury to Surat. **Ex. 6**, p. 8, 11-12.

32. Klamser's takedown of Surat was not at all proportional to the resistance being displayed by Surat. **Ex. 6**, pp. 6, 15.

33. Other reasonably effective alternatives[7] existed at the time, and a reasonably prudent officer would not have slammed Surat to the ground face-first based on the circumstances. **Ex. 6**, p. 9.

34. Surat did not commit a serious crime, did not pose an imminent threat to the safety of Klamser or others, and was not a flight risk. **Ex. 6**, p. 9; *see also* **Ex. 1**, 41:17-24, 45:18-49:3 (agreeing that the potential for injury to him or Klamser by Surat was minimal).

35. Surat's low-level resistance did not rise to the level that justified the use of potentially deadly force or force causing serious bodily injury. **Ex. 6**, p. 9.

36. Given the facts and circumstances confronting Klamser, the use of the rowing arm takedown on Surat was not prudent or justified by established police practices. **Ex. 6**, p. 15.

---

[7] "[O]fficers are not required to use alternative, less intrusive means [of force] if their conduct is objectively reasonable." *Estate of Ceballos v.* Husk, 919 F.3d 1204, 1214 (10th Cir. 2019). Here, Klamser's takedown was not objectively reasonable under the circumstances, and he had variety of alternative uses of force that would not have exceeded the test of proportionality. *See* RMMF ¶34; SADF ¶26.

**Defendant Fort Collins' Policies, Customs, and Practices of Excessive Force Were Moving
Forces Behind the Violation of Ms. Surat's Constitutional Rights**

37. Klamser's use of the rowing arm takedown on Surat was proper under FCPS' use of force policy. **Ex. 5**, 58:19-60:25, **Ex. 7**, 5:11-23; **Ex. 1**, 10:21-11:4.

38. Klamser was trained to use the same amount of force for a rowing arm takedown against any subject, regardless of the subject's size. *See* **Ex. 7**, 88:10-89:12.

39. Klamser and Pastor testified that every action taken by Klamser was consistent with the customs, policies, and practices of FCPS. **Ex. 5**, 77:11-21; **Ex. 7**, 5:11-23, 42:18-22; **Ex. 1**, 12:7-18.

40. Deputy Chief Yeager testified that Fort Collins could use the Surat case and the video footage of the incident to train new recruits on when and how to use the rowing-arm takedown technique in accordance with Fort Collins policy. **Ex. 5**, 77:22-78:10.

41. Klamser was never disciplined, formally or informally, for his use of force against Surat. *See* **Ex. 5**, 78:11-23; *see also* **Ex. 7**, 5:11-23, 38:20-39:2.

42. Klamser's entire chain of command, including FCPS Chief Terry Jones reviewed his use of force on Surat and determined that it was within policy. *See* **Ex. 5**, 78:24-80:8, 84:9-87:21; **Ex. 7**, 5:18-23, 44:3-19.

43. The head defensive tactics trainer for FCPS, Al Brown reviewed Klamser's use of force and found that it was consistent with Fort Collins' training on use of force and when to use the rowing arm takedown technique. **Ex. 5**, 79:11-8, 81:3-8.

44. Officer Brown issued a report saying that Fort Collins trains its officers to act in the exact way that Klamser acted when he used force on Surat. **Ex. 5**, 80:9-13; **Ex. 6**, p. 12.

45. Based on FCPS use of force policies and officer training practices, Fort Collins could fairly anticipate that Klamser would use the force he did against Surat. **Ex. 5**, 88:20-89:3.

16

46. FCPS policy states that officers can use +1 level of force when encountering members of the public who are resisting, which means that the officer is allowed to use one level of force higher than the resistance offered by the member of the public. **Ex. 5**, 102:12-103:11; **Ex. 1**, 48:12-15.

47. Klamser's takedown was in full compliance with how he was trained to use the +1 level of force strategy on resisting members of the public. **Ex. 5**, 108:20-109:19; **Ex. 7**, 5:18-23.

48. FCPS' customs, policies, practices were the moving force behind Klamser's actions through its failure to point out the inherent dangers in the rowing arm technique, endorsement of Klamser's use of potentially deadly force in this situation, failure to effectively investigate the takedown or discipline Klamser, failure to adequately train and supervise, and promotion of Klamser to the position of Corporal after the incident. **Ex. 6**, pp. 17-18.

49. According to Mr. Montgomery, Fort Collins' actions in this case were so egregious that it needs to perform an outside audit of the police department's arrest-control and self-defense training programs, and of the instructors who conduct the training. **Ex. 6**, p. 17.

50. FCPS departmental training issues were the moving force behind Officer Klamser's takedown in this case as evidenced by Klamser's use of imprudent tactics, and the on-scene supervisor's determination that Klamser's tactics were consistent with his training. **Ex. 6**, p. 17.

51. FCPS failed to adequately train Officer Klamser on the appropriate use of physical force and the resulting consequences of physical force when misused. **Ex. 6**, p. 10; *see also* **Ex. 7**, 5:18-23.

52. FCPS officers are not taught about the proportionality of using the takedown technique to the resistance being offered or the inherent dangers of using the rowing-arm takedown technique. **Ex. 6**, p. 12.

53. The rowing-arm takedown maneuver is a sanctioned maneuver by FCPS, and was sanctioned by Fort Collins to be used in the circumstances of Ms. Surat. **Ex. 6**, p. 12.

54. FCPS poorly trains and supervises its officers with regard to the rowing arm takedown technique. **Ex. 6**, p. 14; *see* **Ex. 7**, 37:14-23.

55. FCPS discourages having backup officers present to assist with controlling and handcuffing a female suspect who is resisting because the takedown maneuver will save police resource time and effort. **Ex. 6**, p. 14. This is out of line with established police practices. *Id.*

56. FCPS has a widespread custom, policy, or practice of responding to mild resistance with excessive force, and FCPS fails to properly train and discipline officers regarding violative conduct. *See* FAC ¶¶47-63.

57. On July 9, 2015, Nijal Mason was riding his bike when he was stopped by FCPS officers for suspected drug activity. *See* **Ex. 16**, *Mason IA Investigation*, at 5642. Mr. Mason was not provided the reason for being stopped. *Id.* An officer put Mr. Mason into handcuffs. *See id.* at 5690. Mr. Mason expressed confusion, concern, and anxiety as to what was happening, but the officers ignored his concerns, told him he was under arrest, and moved him toward a parked vehicle. *See* **Ex. 17**, *Mason Incident BWC*, FC Surat 5734 at :25. When an officer told Mason to calm down and stop resisting, Mason anxiously shouted that he was not resisting while turning his head toward the officers. *Id.* Despite being in handcuffs and surrounded by three officers, an officer took Mason to the ground and shoved his face into the pavement, where two other officers jumped on top of Mason and restrained him. *Id.* Despite Mason's low-level resistance and the minimal threat he presented, Fort Collins did not find any violation regarding any of the officers' use of force. *See* **Ex. 16**, at 5694.

58. On March 29, 2012, Nicholas Wiedrich went out to a bar to celebrate his friend's move into town. *See* **Ex. 18**, *Wiedrich IA Investigation*, at 5222. When the bouncer asked Wiedrich for his address, he was unable to provide it to him because he recently moved and did not have it. *Id.*

The bouncer thus denied Wiedrich entry. *Id.* As Wiedrich walked away, he pushed over the rope

stand in frustration. *Id.* The bouncer stopped Wiedrich and two officers tackled him to the

ground. *Id.* Wiedrich was charged with criminal trespass and resisting arrest. *Id.* at 5225. Despite

Wiedrich's minor crimes, lack of immediate threat to the officers or others, and minimal

resistance, Fort Collins did not find any violation regarding the officers' unreasonable takedown.

*Id.* at 5694.

59. Undersigned counsel have settled two other cases of excessive force against Fort Collins in

the matters of Kimberly Chancellor and Natasha Patnode. *See* FAC ¶¶59-60. In October 2016,

Ms. Chancellor was tackled to the pavement (not nearly as forcefully as Ms. Surat was) after she

was pulled over for a minor traffic violation. *Id.* at ¶59. Believing the man in an unmarked

motorcycle was a strange man following her, she parked her car and hurried to her apartment. *Id.*

When the man yelled that he was a FCPS officer and she was going to be arrested, she stopped,

and the officer forced her to walk back to her vehicle. *Id.* As Ms. Chancellor looked for her

license in her purse, the officer reached for her purse, and she pulled away. In response to this

perceived resistance, the officer tackled Ms. Chancellor to the ground. *See* FAC ¶59. She

sustained cuts and bruises to her face and arms, and her case settled for $125,000.

60. In March 2018, Ms. Patnode was shoplifting in Target when she was thrown to the ground

and punched repeatedly in a prone position by a FCPS officer. *See* FAC ¶60. When Ms. Patnode

was brought to the ground, her arm and purse were stuck under her body, which the officer

perceived as resistance. *Id.* The officer told Ms. Patnode to stop resisting and punched her in her

arm dozens of times. *Id.* She sustained numerous, large, and painful bruises on her arms, torso,

and shoulders. Her case settled for $325,000.

61. Yet another case of excessive force brought by undersigned counsel against Fort Collins is

that of Sean Slatton, which is currently in litigation. *See* FAC ¶61. In December 2016, Mr.

Slatton was kicked out of a sorority formal after being falsely accused of bringing a flask. He left

the building without issue and stood on the sidewalk to call an Uber. *Id.* Two FCPS officers

followed Mr. Slatton outside and demanded he leave the premises. *Id.* Mr. Slatton explained that

he was waiting for his ride. *Id.* The officer demanded to see Mr. Slatton's identification, and Mr.

Slatton objected and walked away. *Id.* In response to his resistance, the officer told Mr. Slatton

that he was under arrest, and Mr. Slatton replied that he was not. *Id.* The officer then struck Mr.

Slatton in the leg with a baton and pepper sprayed him in the face. *Id.* Judge Jackson in his Order

on the motions to dismiss found the officer's use of force excessive (while dismissing the

individual officer defendant because the law was not clearly established), and allowed the

plaintiff's *Monell* claim against Fort Collins to proceed. *Slatton v. Hopkins*, Civil Action No. 18-

cv-3112-RBJ, 2020 U.S. Dist. LEXIS 140248 (D. Colo. Aug. 6, 2020).

## **Defendant Klamser and Material Witnesses for Defendants Lack Credibility**

62. When Surat was arrested, Klamser initially charged her with third degree assault and

obstruction. *See* **Ex. 19,** Summons and Complaint; *see also* **Ex. 7***,* 61:10-12.

63. On August 23, 2017, the assault charge was dropped by the District Attorney's office and

amended to be resisting arrest. **Ex. 7**, 62:6-10. *See* **Ex. 20,** Motion to Amend and Order.

64. FCPS policy requires police officers claiming injuries on the job to have their injuries

photographed. *See* **Ex. 7***,* 61:1-4.

65. Despite Klamser's claims that Surat dug her nails into his neck, scratched him, hit him, and

tried to choke him, causing him pain, Klamser did not have any photographs taken of his injuries

and never received any medical attention. When asked if he ever saw any marks on his neck, he

testified that he could not "see his neck" and did not bother to check if there were any marks. *See Klamser* 60:11-64:9.

66. Deputy Chief Yeager testified that, from reviewing the video footage, he did not see Ms. Surat grab Klamser's neck, nor did he see her hit Klamser's chest. *See* **Ex. 5**, 39:25-40:11.

67. At no time during the incident did Officer Pastor hear Klamser telling Surat not to hit him, nor did Klamser express that he was being attacked by her. *See* **Ex. 1**, 46:12-25.

68. Based on everything Officer Pastor knew about this case, including what he witnessed or heard on scene and from conversations he had with Klamser, his perception of Surat was that she was trying to pull away from Klamser rather than attack him in any way. *See* **Ex. 1**, 46:8-47:3.

69. After reviewing numerous records in this case, Mr. Montgomery saw no evidence that Klamser was attacked by Surat. He likewise perceived from the body camera footage that Surat was attempting to avoid being grabbed by Klamser. **Ex. 6**, pp. 2, 15.

70. Mr. Findlay, a material witness for Defendants, described the takedown as:

   a. "… she went tumbling and kind of he [sic] went with her." **Ex. 10**, 26:3-4.

   b. *Compare* **Ex. 10**, 28:13-14 ("… it looked like she could have fallen by herself"), *with* **Ex. 10**, 28:23-29:1 ("I said she tried to strike Officer Klamser. He had her arms. He dodged it and then went down with her. I didn't say she fell on her own accord, though").

   c. Q: "do you believe Klamser used a lot of force to put her on the ground?" A: "No, I don't believe he used a lot. . . . I believe they were both intertwined, and yes, some force could have been used. I didn't see it. So are you asking me what I saw or what I believe?" **Ex. 10**, 29:4-11.

Not only did Findlay quickly contradict his own testimony and then admit that he did not see the takedown, but much of his testimony is blatantly contradicted by Klamser's body camera footage. *See* Defs. Ex. B; *see also* **Ex. 9**.

71. Findlay testified that during the encounter between Klamser and Surat, the crowd reacted four times, including a "big reaction" when Surat purportedly "hit" Klamser. *See* **Ex. 10**, 42:3-12. This is demonstrably false from the video footage. *See* Defs. Exs. B and I.

72. Portraying Findlay's extreme exaggeration, he also testified that when Surat was trying to reach Waltz by walking past Klamser and the bouncer at the start of the interaction, she looked like "she was trying to audition to be a defensive lineman on the CSU football team trying to get the quarterback." **Ex. 10**, 37:21-25. A reasonable jury would not believe so from viewing the body camera footage, and even the bouncer, Mr. Esslinger, testified that it seemed like Surat was "possibly in a hurry to try and get past us. And from looking at the video… Officer Klamser and I were definitely taking up the majority of the doorway there. . . . I think she was just trying to get past me." **Ex. 3**, 27:22-28:1.

73. Findlay also contradicted statements he made in his police statement. When specifically asked by both defense counsel and Plaintiff's counsel about his thoughts on the crowd, Findlay made no remark about the crowd's hostility toward the police, despite his exaggerated claims in his police statement describing the crowd as one of the main reasons as to why he felt compelled to provide a statement to FCPS. *Compare* **Ex. 10,** 19:4-8, 42:3-23, *with* **Ex. 21,** Findlay Police Statement. Significant jury questions exist regarding the credibility of Mr. Findlay.

74. Bondi Beach Bar bouncer, Mr. Esslinger repeatedly testified that his attention was split between his bouncer duties at the bar and what was happening between Surat and Klamser. *See* **Ex. 3**, 29:24-30:1-2 ("I wasn't directly watching, you know, their interaction the whole time");

22

*see also* **Ex. 3***,* 32:14-18 (when asked by counsel to describe what occurred after Klamser told Surat to keep on walking, he stated, "once again, my attention was flipped between our fence line, you know, my responsibilities towards the bar and my job there and, you know, kind of what was going on in the square between Michaella and Officer Klamser."); **Ex. 3***,* 33:11-13 ("again, I'm not sure if I actually witnessed the takedown maneuver or if it was – you know, I've seen the video several times.").

75. When asked by Plaintiff's counsel whether Mr. Esslinger believed throwing a 100-pund woman to the ground causing a concussion because "she's trying to pull away from you" is excessive force, Mr. Esslinger replied, "[w]asn't she trying to actively, you know, fight against them, not just pull away?" In response, counsel asked, "[w]ell, did you see her throw punches at him?" Esslinger replied, "I saw her arms flailing around." Counsel then asked, "Did you not see Officer Klamser grab her by the wrist as she was trying to get his hands off her wrist?" Mr. Esslinger replied, "No. Like I said, my attention was split. You know, I was watching – I wasn't just watching from the fence line." **Ex. 3***,* 49:13-21.

76. Despite having the opportunity to reaffirm the claims he made in the verbal statement he gave to Klamser the night of the incident where he alleged Surat was trying to "paw or claw" at Klamser, *see* Defs. Ex. A, Esslinger repeatedly affirmed that he was not focused on the interaction between Klamser and Surat, did not see many parts of the interaction, and did not reassert that Surat hit Klamser. SADF ¶¶71-3.

## STANDARD OF REVIEW

Summary judgment is appropriate only when no evidence of a genuine issue of material fact exists. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). The burden is on the moving party. *Trujillo v. Atmos Energy Corp.*, No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist.

LEXIS 87273, at *4 (D. Colo. June 25, 2012). The nonmovant is given "wide berth to prove a factual controversy exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). All reasonable inferences are drawn in the light most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 484 (10th Cir. 1995). "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifan Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984). When qualified immunity is raised, "we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

## ARGUMENT

The factual allegations and evidence presented in Plaintiff's FAC and present response show: (1) Defendants violated Ms. Surat's Fourth Amendment right to be free from excessive force when Klamser used a violent takedown to effect Ms. Surat's arrest; (2) the right to be free from such excessive force was clearly established; and (3) Fort Collins' customs, policies, and practices of using, condoning, and failing to train and supervise on excessive force were the moving forces behind the violation of Ms. Surat's constitutional rights.

As this Court described in its Order on Defendants' first motion to dismiss, "[t]he state court's finding that [an arrestee] resisted a lawful arrest ... may coexist with a finding that the police officers used excessive force to subdue h[er]." *Martinez v. City of Albuquerque*, 184 F.3d 1123, 1126-1127 (10th Cir. 1999); *see* Doc. 84, at 12-15. A claim for excessive force is barred under *Heck* if, "[i]n order to prevail …, [s]he would have to negate an element of the offense of which [s]he has been convicted." *Martinez*, 184 F.3d at 1125 (quoting *Heck*, 512 U.S. at 487 n.6). Remaining cognizant of *Heck*, Plaintiff only challenges Klamser's use of the rowing-arm

takedown to effectuate her arrest, while taking as given Surat's convictions of obstruction and resisting arrest. Considering Surat's misdemeanor convictions, her crimes were not severe and she posed little to no immediate threat to the safety of the officers or others. Moreover, while she undoubtedly resisted arrest, her resistance was minimal. Under the circumstances and taken in the light most favorably to Surat, Klamser's takedown slamming Surat face-first into the concrete was unreasonable and excessive in violation of her Fourth Amendment rights.

A.  **Defendant Klamser Violated Ms. Surat's Fourth Amendment Right to be Free from Excessive Force When He Slammed Her Face-First onto the Concrete.**

A plaintiff prevails on her Fourth Amendment claim for an officer's use of excessive force if she demonstrates: "(1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional." *Cortez v. McCauley*, 478 F.3d 1108 n. 25 (10th Cir. 2007). "The reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal quotations omitted). Assessing the reasonableness of police use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 2020 vision of hindsight." *Id.* at 396.

The relevant inquiry is whether "the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Id.* at 397. The totality of the circumstances must be taken into account, and the Supreme Court has delineated three, non-exclusive factors relevant to the inquiry: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894

(10th Cir. 2009). The Court must construe the facts in favor of the nonmoving party, thus, Ms. Surat's facts are controlling. *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).

> **i.  Ms. Surat's crimes were minor, misdemeanor offenses.**

At Ms. Surat's criminal trial, she was convicted of resisting arrest and obstruction of a peace officer, both minor, misdemeanor offenses. SADF ¶¶1, 34; **Ex. 5**, 32:15-18; Pastor 45:14-16. *See also Roe v. City of Cushing*, No. 93-6039, 1993 U.S. App. LEXIS 31404, at *8 (10th Cir. Nov. 24, 1993) (finding plaintiff's conviction of resisting arrest and underage possession of alcohol minor and not severe); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (finding obstruction to be a minor crime). These "minor offense[s]—at most—support the use of minimal force." *Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016); *Fisher v. City of Las Cruces*, 584 F.3d 888, 895 (10th Cir. 2009) (stating a petty misdemeanor weighs in favor of using minimal force).

The rowing-arm takedown is not a minimal use of force. Mr. Montgomery opined that "[a] takedown maneuver where someone is forcefully taken to the ground where their contact with the ground results in them striking their head and/or neck falls into the same category" as striking, shooting 40 mm stun rounds, or otherwise causing blunt force trauma to a person's head or neck because they "create a substantial risk of causing death or serious bodily injury." **Ex. 6**, pp. 11-12; *cf. Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) ("Although tasers may not constitute deadly force, their use unquestionably 'seizes' the victim in an abrupt and violent manner. Accordingly, the 'nature and quality' of the intrusion into the interests of [the plaintiff] protected by the Fourth Amendment was quite severe."). Moreover, unlike an arrest-control tactic, the rowing-arm takedown is a defensive tactic that may be appropriate "where an officer is defending himself or herself where they've been attacked or there's an

imminent attack pending from a credible source." **Ex. 8**, 51:17-52:4; *see* SADF ¶¶26-8. Klamser inappropriately used a defensive tactic of potentially deadly force in an arrest-control situation when he slammed Ms. Surat to the pavement face-first in response to her minor crimes. *See* **Ex. 6**, pp. 10-12. Ms. As such, the first *Graham* factor weighs in her favor.

> ### ii.  Ms. Surat posed little to no immediate threat to the safety of Klamser or others.

The second *Graham* factor – whether the suspect posed an immediate threat to the safety of the officers or others – "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Reavis v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020). In assessing the reasonableness of the officer's actions, the court considers whether the officer was "in danger at the precise moment that they used force[.]" *Id.*

In *Morris v. Noe*, officers arrived at a residence for a domestic dispute. 672 F.3d 1185 (10th Cir. 2012). Upon arrival, the officer encountered the plaintiff and two others who were yelling in the front yard, saw clothes burning in the front yard, and observed significant vehicle damage with broken glass on the ground. *Id.* at 1189. Two more officers arrived on scene, and the plaintiff's husband, Morris arrived shortly thereafter. *Id.* at 1189-90. Morris was six feet, four inches tall, weighed 250 pounds, and was unarmed. *Id.* Morris stated to one of the residents, "[w]hy was you talking to Mama that way?" *Id.* at 1190. The resident approached Morris in confrontation, so Morris put his hands up and began backing up towards the police officers. *Id.* Two of the officers lunged at Morris and ran him into the bushes, throwing him to the ground. *Id.* While arresting Morris, the officer smelled alcohol and noticed Morris exhibited signs of intoxication. *Id.* The court held that the officers' takedown of Morris was objectively unreasonable, and that despite Morris' large size, backing toward the group of officers which

might have presented a threat, and asking the resident a confrontational question, he posed little to no immediate threat to the safety of the officers or others. *Id.* at 1196.

In *Cook v. Peters*, 604 Fed. App'x 663 (10th Cir. 2015), the plaintiff, a teenager, was at a shopping mall when he was told to leave. *Id.* at 664. Before leaving, the plaintiff cursed at the defendant security guard/sheriff. *Id.* The sheriff used a forceful takedown to arrest the plaintiff for misdemeanor breach of the peace. *Id.* In finding for the plaintiff, the lower court found that the sheriff was eleven inches taller and 200 pounds heavier than the plaintiff, the plaintiff resisted arrest by pulling away from the sheriff, and the plaintiff posed little immediate threat to anyone. *Id.* at 664-65. The Tenth Circuit affirmed, finding the officer's takedown excessive and the right to be free from such force clearly established. *See id.*, at 664-69. In so finding, the court emphasized the weight and height disparity between the plaintiff and the sheriff, the minor crime committed, and the lack of significant threat to the officer or bystanders. *Id.* at 665-667.

In *Shannon v. Koehler*, the plaintiff was drunk at the bar he owned and arguing with two women who had arrived to drive him home. 616 F.3d 855, 858 (8th Cir. 2010). Surveillance video showed the three arguing and the plaintiff punching one of the women. *Id.* In response, the other woman shoved the plaintiff who stayed on the floor until the bartender helped him up. *Id.* When the police officer arrived, the woman stated that another woman in the bar was grabbed by the plaintiff. *Id.* When the plaintiff saw the officer, he "strongly state[d]", using profanity, that he owned the bar and ordered the officer to leave, while coming within arms-length of the officer. *Id.* The officer then performed a takedown, causing the plaintiff to hit a barstool and land on the hardwood floor, sustaining serious injuries. *Id.* at 858, 863. The lower court found that the plaintiff had not committed a serious crime, was not attempting to flee or actively resisting

28

arrest,[8] and that he posted little or no threat to the officer or others. *Id.* at 862. The Eighth Circuit affirmed the officer's denial of qualified immunity on appeal.

Here, Surat posed little to no imminent or serious threat to the safety of Klamser or others. SADF ¶34; **Ex. 6**, p. 9. Like the young and small plaintiff in *Cook*, Ms. Surat was nearly half of Klamser's size at 115 pounds compared to his 200 pounds, and it was obvious to Klamser and Pastor that she was a young college woman dressed to go out on the town. SADF ¶¶9-11, 13. It was likewise clear to Klamser and Pastor that Surat was unarmed. *See* SADF ¶¶7-8. Even Pastor agreed that Surat did not pose a severe threat to Klamser or anyone else. *See* **Ex. 1**, 41:17-24. Unlike the circumstances in *Morris* where the officers arrived to a concerning scene of a burning pile of clothes, broken glass, and yelling, and where Morris was a very large man who may have presented a threat, Klamser and Pastor were in a college town responding to a disturbance at a bar that had already dissipated by the time they arrived, where the circumstances were familiar to them and did not present signs of immediate danger, and they had no reason to believe that Surat would be violent when they encountered her. *See* SADF ¶13; **Ex. 1**, 36:17-37:8.

Moreover, as evidenced by the body camera footage, Surat never hit, struck, scratched, or grabbed Klamser's throat. *See* RMMF ¶¶24-5, 29, 33, 36, 40; SADF ¶¶4-6, 59-70. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

---

[8] The plaintiff was convicted for interfering with official acts, a misdemeanor offense with an element of "resisting or obstructing … a peace officer." *Shannon*, 616 F.3d at 863 n.4. However, the district court did not give preclusive effect to his crime because the parties had not "sufficiently discussed" the basis for the conviction. Based on the plaintiff's allegations, the lower court determined that the plaintiff was not actively resisting arrest. *Id.* The district court's finding was undisturbed on appeal.

should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment."). Surat's resistance and obstruction by using choice words and trying to pry

Klamser's hands off her, while demonstrative of her crimes, did not make her a threat, let alone

an immediate threat, to the safety of Klamser or others. *See Shannon*, 616 F.3d at 865 ("The use

of any force by officers simply because a suspect is argumentative, contentious, or vituperative is

not to be condoned.") (internal quotations omitted); *see also Cook*, 604 Fed. App'x at 667

(dismissing the utterance of a curse word as threatening in light of the defendant's size compared

to the plaintiff); **Ex. 1**, 41:25-42:7 (agreeing that Surat appeared to be pulling away from

Klamser).

Defendants' argue that Klamser could not fulfill his duties as a cover officer to Pastor

once he became occupied with Surat, thus creating a greater need to quickly subdue her. This

claim only further demonstrates Defendants' willful and reckless attitude toward their duty to use

reasonable force. *See* SADF ¶55; **Ex. 6**, p. 14 (FCPS supported Klamser's takedown of Surat

because, among other reasons, it "eliminated the need for additional officers"). Saving police

resources is not a valid justification for using unreasonable and disproportionate force, and this

justification is not in concert with established police practices. *See* **Ex. 6**, p. 14. Moreover, Waltz

was very compliant and Pastor had no issues dealing with him. *See* **Ex. 1***, 22:4-6. When asked by

Plaintiff's counsel, Pastor plainly agreed that Klamser could have asked him for help, and that

the two of them could have easily controlled Ms. Surat. *See* **Ex. 1***, 27:17-23. Further, Deputy

Chief Yeager also agreed that even if Ms. Surat had escaped, she would not have posed a risk of

harm to Klamser or others. *See* **Ex. 5**, 49:20-50:23. In sum, Surat posed little to no immediate

threat to the safety of Klamser or others, even as she continued her resistance. Under these

circumstances, the second *Graham* factor weighs heavily in Ms. Surat's favor.

### iii. Ms. Surat's low-level resistance and minimal flight risk did not justify the use of potentially deadly force.

The third *Graham* factor – actively resisting arrest or attempting to flee – justified *some* force against Ms. Surat, but the critical inquiry is whether Klamser's takedown was "proportionate to the resistance offered." *Roe v. City of Cushing*, No. 93-6039, 1993 U.S. App. LEXIS 31404, at *9 (10th Cir. Nov. 24, 1993). Even where a person fails to follow an officer's orders, the officers are not entitled to employ anything more than reasonable force to make an arrest. *See Martinez*, 184 F.3d at 1127 ("[F]ailing to heed the arresting officers' instructions and closing his vehicle's window on the arm of one of the arresting officers . . . might justify the officers' use of reasonable force to effectuate Martinez' arrest, but would not authorize the officers to employ excessive or unreasonable force in violation of *Martinez*' Fourth Amendment rights."). "Noncompliance with lawful orders justifies some use of force, ***but the level of justified force varies based on the risks posed by the resistance***." *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016) (emphasis added). "Resistance… should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Aldaba v. Pickens*, 777 F.3d 1148, 1158 (10th Cir. 2015). As Mr. Montgomery opined, Ms. Surat "was in fact resisting arrest but her low-level resistance did not rise to the level that justified the use of potentially deadly force." **Ex. 6**, p. 9.

In *Long v. Fulmer*, 545 Fed. App'x 757 (10th Cir. 2013), the plaintiff attempted to check out various items from a university hospital cafeteria without knowing the cafeteria was closed. *Id.* at 759. After getting into a disagreement with the cafeteria manager, the police were called and two officers arrived. *Id.* The officer attempted to place the plaintiff under arrest, but the plaintiff resisted and claimed he did nothing wrong. *Id.* The officer grabbed the plaintiff and

instructed him to submit to arrest while attempting to physically restrain the plaintiff, but the plaintiff "protested and pulled away, asserting again that he had committed no crime." *Id.* at 759-60. The officer tackled the plaintiff to the ground, causing the plaintiff's shoulder to become separated. *Id.* at 760. The plaintiff was charged with a misdemeanor which was later dismissed by the prosecutor. *Id.* at 759. In finding the officer's use of force excessive, the court determined the plaintiff's crime was minor, he posed no threat to the safety of officers or others, and despite the plaintiff's resistance weighing slightly in the officer's favor, the plaintiff's resistance was "only minimal." *Id.* at 760. The court on appeal affirmed the denial of qualified immunity. *Id.*

In *Roe v. City of Cushing*, the plaintiff, a minor, was sitting in a parked truck with friends when an officer approached them and began talking to his friend. 1993 U.S. App. LEXIS at *3-4. The officer then witnessed the plaintiff put a beer in his jacket and ordered the plaintiff to stand in front of the police car, to which he complied. *Id.* at 4. A second officer arrived and asked the plaintiff whether he "had a fucking problem." *Id.* The plaintiff answered, "I might, if [you don't] quit fucking with my sisters." *Id.* The plaintiff repeated this statement to the other officer. *Id.* at *5. The officer told the plaintiff that he was under arrest and took him to the ground, where the officer's knees landed on top of the plaintiff's back, causing the plaintiff's head to strike the concrete. *Id.* The plaintiff was convicted of resisting arrest and possession of a nonintoxicating beverage by a minor. *Id.* at *6. The court affirmed the denial of summary judgment, finding that the plaintiff's crimes were not severe, there was little evidence he posed an immediate threat to the officers or others, and although he was resisting arrest, "it [wa]s not clear that the force used was proportionate to the resistance offered." *Id.* at *8.

*Long*, *Roe*, *Cook*, and *Shannon* demonstrate how minimal levels of resistance, where there is no flight risk, the crimes at issue are not serious, and there is no immediate threat to the

officers or others, do not justify takedowns. Like the plaintiff in *Roe* who was convicted of resisting arrest, used offensive words, made a threatening statement to the officers, and was taken to the ground sustaining minor injuries compared to Surat, Surat's resistance of dismissing Klamser's orders, turning away from him, and attempting to pry his hands off her arm did not justify being slammed face-first to the concrete, causing a concussion. *See* SADF ¶¶6, 21-3. This is so even considering Klamser's lawful, lesser uses of force prior to the takedown. Just as the *Long* court found the takedown unjustified despite the plaintiff's protest, pulling away, and again asserting that he had committed no crime *after* the officer's verbal instructions to submit and attempts to physically restrain the plaintiff failed, Klamser's decision to slam Ms. Surat face-first to the concrete was not objectively reasonable considering her low-level resistance, the lack of immediate threat she posed, and her minor, misdemeanor crimes. *See Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016) (finding officers who shattered the plaintiff's car window and pulled her through the broken window to arrest her plainly exceeded the amount of force proportional to the plaintiff's misdemeanor and the lack of threat she posed, despite the plaintiff having "rolled up her window, left her keys in the ignition, and refused to exit the vehicle when ordered to do so.").

Furthermore, Ms. Surat was not a flight risk, nor do Defendants' claim so. *See* SADF ¶34. Surat was wearing high heels, did not run from Klamser, and Klamser had her partially restrained by holding her firmly by her wrist throughout their encounter. SADF ¶¶14-5. Pastor was also present and available to assist with the arrest, and multiple bouncers were also nearby. SADF ¶12; RMMF ¶34. Surely, Surat's flight risk was even more marginal than the plaintiff in *Davis* who, despite keeping her key in the ignition and refusing to exit her vehicle, was not deemed a flight risk because she did not attempt to flee and her car was surrounded by police vehicles. Moreover, the situation was not so uncertain, dangerous, or rapidly evolving that

Klamser was forced to make a split-second judgment in slamming Surat to the ground. Klamser had enough time to converse with Surat and give her instructions, and no one was in danger. *See* SADF ¶17; *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (explaining that the officer had "enough time to recognize and react to the changed circumstances and cease firing his gun"); **Ex. 8**, 60:24-61:5 (describing how Klamser can be seen in the body camera footage getting ready to do the face plant and how he was engaged in a measured conversation with Surat immediately prior to the takedown).

It is undisputed that some degree of limited force was justified to overcome Surat's resistance. However, "[w]hen we turn an eye toward *the proportionality* of the force in light of all these circumstances," *Estate of Armstrong*, 810 F.3d at 902 (emphasis in original), it is clear that Surat's "low-level resistance did not rise to the level that justified the use of *potentially deadly force*" by way of slamming her to the concrete head-first. **Ex. 6**, pp. 9-12 (emphasis added). "[O]fficers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Deville v.* Marcantel, 567 F.3d 156, 167 (5th Cir. 2009). Klamser admitted that he used a considerable amount of force when he took Surat to the ground, causing her head to strike the concrete first while her feet were in the air. SADF ¶19; **Ex. 9**. Klamser also knew that the rowing-arm takedown could not be done slowly and gently. SADF ¶20. Instead of "adjust[ing] [his] actions to avoid unnecessary escalations of force" *Emmett v. Armstrong*, 973 F.3d 1127, 1136-37 (10th Cir. 2020), Klamser "essentially deployed an atom bomb in this case" and used exceedingly greater force than necessary when he threw Surat face-first to the pavement. **Ex. 8**, 61:14-19; *see* RMMF ¶34. Like the court in *Long* who considered the officer's attempts to effect the plaintiff's arrest through lesser uses of force but nonetheless found the takedown objectively unreasonable when considering the *Graham* factors, Klamser's

takedown was likewise unreasonable and highly unnecessary under the totality of the circumstances.

**B. Ms. Surat's Right to Be Free From Excessive Force Under the Circumstances was Clearly Established.**

Qualified immunity only shields government officials from liability if the official's challenged conduct did not violate a clearly established constitutional right that a reasonable official would have known of at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Ordinarily, the law is clearly established when there is a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Ullery v. Bradley*, 949 F.3d 1282 (10th Cir. 2020). However, this Court has stressed that courts "cannot find qualified immunity wherever [they have] a new fact pattern." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). Instead, "[e]ven when no precedent involves facts materially similar to [the case at issue], the right can be clearly established if a precedent applies with obvious clarity." *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017). In deciding whether the law was clearly established,

> this court employs a 'sliding scale' under which 'the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Shroff v. Spellman*, 604 F.3d 1179, 1189-90 (10th Cir. 2010) . . . . After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing.

*Browder v. City of Albuquerque*, 787 F.3d 1076, 1082-83 (10th Cir. 2015).

The Supreme Court has made clear that a finding of clearly established law does "not require a case directly on point, [as long as] existing precedent … [has] placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting

*White v. Pauly*, 137 S. Ct. 548, 552 (2017)). "It is not necessary…for plaintiffs to find a
case with exact corresponding factual circumstances; defendants are required to make reasonable
applications of the prevailing law to their own circumstances." *Currier v. Doran*, 242 F.3d 905,
923 (10th Cir. 2001) (citation omitted). "When an officer's violation of the Fourth Amendment is
particularly clear from *Graham* itself, we do not require a second decision with greater
specificity to clearly establish the law." *Davis*, 825 F.3d at 1136. If the *Graham* factors alone
support that the challenged conduct "was clearly unjustified," the Court will find that the
constitutional right was clearly established. *See Cook v. Peters*, 604 F. App'x 663, 667 (10th Cir.
2015); *Morris*, 672 F.3d at 1197-98 ("[W]e may conclude a constitutional right was clearly
established, even in the absence of similar prior cases, if the force is clearly unjustified based on
the *Graham* factors."); *Emmett*, 973 F.3d at 1137 (citing to *McCoy v. Meyers*, 887 F.3d 1034,
1052-53 (10th Cir. 2018) to state that the court looks to "the decisive factual circumstances" and
may rely on cases that "are not factually identical," but "are factually analogous").

The Tenth Circuit in *Morris v. Noe* clearly established that a forceful takedown of a non-
violent misdemeanant who posed little to no immediate threat to the officers or others would
violate the Constitution. 672 F.3d at 1198. Like the *Morris* plaintiff, only one *Graham* factor
supported using some level of force against Surat while the other two factors weighed heavily
against it. And, critically, the second and most important factor – whether the suspect posed an
immediate threat to the officers or others – weighed heavily in Surat's favor, as it did in *Morris*.
Citing the First Circuit in *Raiche v. Pietroski*, 623 F.3d 30 (1st Cir. 2010), the *Morris* court
stated,

> A reasonable officer . . . would not have needed prior case law on point to recognize
> that it is unconstitutional to tackle a person who has already stopped . . . and who
> presents no indications of dangerousness. Such conduct is a major departure from
> reasonable behavior under both the *Graham* factors and the officer's training.

*Morris*, 672 F.3d at 1198.

Even clearer here than in *Morris* is that, unlike the *Morris* plaintiff who was tackled and thrown into bushes (on grass), it should be even more obvious that forcefully face-planting a non-violent misdemeanant on concrete – who presents no danger or threat to the officer or others – is significantly more dangerous and unreasonable. Moreover, the *Graham* factors themselves make clear that a reasonable officer in Klamser's shoes would have known that it was unconstitutional to use a forceful takedown of Surat in response to her resistance when her misdemeanor crimes were not serious, she presented no risk of immediate (or any) threat to the officers or others, and her resistance was nonetheless minimal and presented no risk of harm to Klamser or others. *See* SADF ¶¶34-5.

The weight of authority in other circuits also clearly established the unreasonableness of a takedown under similar circumstances. *See Shannon v. Koehler*, 616 F.3d at 858-863 (holding that despite the plaintiff being drunk, combative, shouting profanity at the officer, demanding the officer leave, and coming within arms-length of the officer, the officer's takedown was excessive because the plaintiff had not committed a serious crime, was not attempting to flee or actively resisting arrest, and posted little or no threat to the officer or others); *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) (finding officers' takedown excessive where, despite plaintiff having pulled free from the officer's grasp and refusing to kneel down so the officer could handcuff him, the plaintiff's crime was not serious and he posed no threat to the officers or others); *Smith v. City of Troy, Ohio*, 874 F.3d 938 (6th Cir. 2017) (holding that the plaintiff's minimal resistance by pulling his arm away from officer did not justify knocking plaintiff to the ground face-first); *Sconiers v. Lockhart*, 946 F.3d 1256 (11th Cir. 2020) (despite plaintiff's conviction of resisting, obstructing, or opposing the defendant without violence, the guard's use

of pepper spray and slamming the plaintiff to the ground may have violated the Eighth

Amendment); *Patel v. City of Madison*, 959 F.3d 1130 (11th Cir. 2020) (arguing that even if the

plaintiff resisted arrest, the officer's takedown was not proportional to the marginal resistance

demonstrated).

C. **Fort Collins is Liable for the Violation of Ms. Surat's Fourth Amendment Rights**.

Plaintiff's SADF and supporting evidence show that genuine disputed issues of material

fact exist whether Fort Collins is liable for Klamser's violation of Ms. Surat's Fourth

Amendment right to be free from excessive force. To state a claim for municipal liability under

*Monell v.Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a plaintiff must show (1) the existence

of a municipal policy, practice, or custom, (2) that the defendant enacted or maintained the

policy or custom with the requisite state of mind, and (3) that the policy or unofficial custom

caused the injury alleged (causation). *Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th

Cir. 2013). A municipality's policy or custom may take the form of, among other things, "an

informal custom amounting to a widespread practice that, although not authorized by written law

or express municipal policy, is so permanent and well settled as to constitute a custom or usage

with the force of law," or "the failure to adequately train or supervise employees, so long as that

failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of

Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). "Such a policy or custom may include what

is, in effect, a policy of inaction in the face of knowledge that municipal officials are routinely

violating a specific constitutional right, thus becoming the functional equivalent of a decision by

the [municipality] itself to violate the Constitution. *Trujillo v. City & Cty. of Denver*, No. 16-cv-

1747-WJM-MJW, 2017 U.S. Dist. LEXIS 57530, at *10-11 (D. Colo. Apr. 14, 2017).

The state of mind and causation elements of *Monell* are established if "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). A pattern of tortious conduct provides a municipal defendant with actual or constructive notice that a new policy, custom, or training program is necessary, and its "continued adherence to an approach that [it] know[s] or should know has failed to prevent" or has caused "tortious conduct . . . may establish the conscious disregard for the consequences of [its] action… necessary to trigger municipal liability." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1988). Similarly, if the constitutional violation was the highly predictable consequence of a custom or policy, an inference of causation arises. *See Brown*, 520 U.S. at 409-10.

With respect to the first element, Plaintiff has thoroughly explained why Defendant Klamser is not entitled to summary judgment on Plaintiff's excessive force claim.[9] Plaintiff can also demonstrate that Fort Collins is likewise not entitled to summary judgment on Plaintiff's municipal liability claim because Fort Collins' customs, policies, and practices of using and condoning excessive force were the moving force behind the violation of Surat's Fourth Amendment rights. *Id.*

> i. **Fort Collins Has a Custom, Policy, or Practice of Using, Tolerating, and Ratifying Excessive Force.**

Fort Collins is liable because it failed to adequately supervise and train its officers despite the obvious need for it do so. "[T]he inadequacy of police training may serve as a basis for §

---

[9] Even if this Court determines that Defendant Klamser is entitled to qualified immunity because the law prohibiting his conduct was not clearly established – a result foreclosed by the evidence presented by Plaintiff – municipal liability may still attach to Fort Collins. *Myers v. Oklahoma County Bd. Of. Cty. Cmm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998).

1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "If the city promulgates a constitutional policy but trains its officers to violate that policy, however, a facially constitutional policy will not shield the city from liability and a causal connection could be established." *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009). Even a single incident involving excessive force may evidence a failure to train where the unconstitutional consequences of failing to train are "patently obvious." *Connick v. Thompson*, 563 U.S. 51, 64 (2011); *see also Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997). When all plausible inferences are drawn in Plaintiff's favor, as they must be, the need to train law enforcement officers on reasonable use of excessive force was obvious. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

First, Plaintiff's SADF fulsomely describes Klamser's objectively unreasonable use of force in violation of the Fourth Amendment. *See* SADF ¶¶32-5. Second, the facts surrounding Klamser's takedown demonstrate the usual and recurring situation that gave rise to Klamser's use of force under the circumstances. For example, Klamser and Pastor often patrolled Old Town at night and encountered college women like Surat "frequently." **Ex. 1**, 36:17-37:1; *see Ortega*, 994 F. Supp. 2d at 1038 (finding the incident at issue constituted a usual and recurring situation where, aside from the use of force, nothing about the incident appeared to be out of the ordinary). Indeed, the very next night after Surat's arrest, Klamser was again on duty in Old Town and encountered an intoxicated, college-aged man who he arrested with the help of other officers. *See* **Ex. 7**, 10:23-12:16. In addition, Plaintiff's FAC and SADF describe eight other instances of FCPS officers using excessive force, including takedowns in similar circumstances, exemplifying the ordinary and recurring nature of situations like the one before us, and Fort

Collins' custom and practice of using excessive force in response to perceived resistance. *See* FAC ¶¶55-61; SADF ¶¶57-61.

Third, as to the state of mind and causation elements, Klamser's use of the rowing arm takedown on Surat was deemed proper under FCPS policy. SADF ¶¶37, 39, 42-3. In so finding, municipal policymakers including FCPS Chief Terry Jones, Deputy Chief Yeager, and head defensive tactics trainer Officer Brown reviewed Klamser's takedown of Ms. Surat and determined that it was consistent with FCPS policy and training. SADF ¶¶39, 42-3, 46-7. Following the incident, Officer Brown issued a report stating that the rowing-arm takedown was "agency approved" and that FCPS trains its officers to act in the exact way that Klamser acted when he executed the takedown on Surat. SADF ¶¶44, 53; **Ex. 6**, p. 12. Deputy Chief Yeager even testified that Fort Collins could use the Surat case and video footage of the incident to train new recruits on when and how to use the rowing-arm takedown in accordance with FCPS policy. SADF ¶39. In addition, Klamser and Pastor both testified that they acted exactly as FCPS trained them to act, and conducted themselves in accordance with and pursuant to the customs and practices of Fort Collins. Such binding admissions establishes the causation prong of *Monell* liability, as Judge Kane has explained: "if [d]efendant [p]olice [o]fficers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the [municipality] implemented a different training policy on the use of force, [the plaintiff] would not have been subjected to the amount force used in this case." *Moore v. Miller*, No. 10-cv-651-JLK, 2014 U.S. Dist. LEXIS 72452, at *27 (D. Colo. May 28, 2014); *see also Ortega,* 944 F. Supp. 2d at 1039 (D. Colo. 2013) (reaching the same conclusion). In sum, Fort Collins' "failure to take disciplinary action in response to an illegal [act], when combined with other evidence, could tend to support an inference that there was a preexisting de

41

facto policy of [illegal actions]: the policymaker did not discipline the employee because, in the

policymakers' eyes, the employee's illegal conduct actually conformed with municipal policy."

*Milam v. City of San Antonio*, 113 F. App'x 622, 628 (5th Cir. 2004).

Lastly, Fort Collins' need to properly train officers in the constitutional limitations on the

reasonable use of force and the rowing-arm takedown was extremely obvious. Mr. Montgomery

opined, and Klamser acknowledged that officers like himself are taught to avoid striking or

injuring someone in the head, neck, or spine because it may cause serious bodily injury or even

death. SADF ¶29; **Ex. 7**, 35:1:19. Despite this well-known principle, Fort Collins never trained

its officers that slamming an individual head-first on concrete presents the same risks of causing

serious bodily injury as striking or shooting a subject in the head or neck with a baton or 40 mm

stun rounds. SADF ¶¶29, 50. In like manner, "[n]owhere in his report does Fort Collins Police

Officer Al Brown, who is the defense expert witness in this case, indicate how specifically Fort

Collins Police Officers are taught to avoid causing injury to even serious bodily injury or death

during this 'rowing arm takedown' maneuver. He only points out that this is a department-

sanctioned maneuver *without any discussion on the proportionality of such force to the*

*resistance being offered or the inherent dangers of using such a tactic*." **Ex. 6,** p. 12 (emphasis

added); SADF ¶52. Furthermore, Mr. Montgomery opined that Brown testified at the criminal

trial that the rowing arm takedown is "designed to result in somebody smashing their head into

the ground." **Ex. 6***, pp. 16-7. Brown stated, "yeah, that's expected. It's routine. Yeah you're

gonna smack your chin on the ground on the rowing arm technique because instinctively you're

gonna put out your arm to brace your fall, but then, boom, you're gonna hit your chin." *Id.*

Brown's callous and indifferent statements ignoring the significant risk of harm posed by such a

takedown may itself demonstrate Fort Collins' deliberate indifference. Indeed, Mr. Montgomery

found Fort Collins' endorsement of Klamser's face-plant without proper training, investigation, and discipline of Klamser so egregious that he suggested FCPS perform an outside audit of the department's arrest control and self-defense training programs, and of the instructors who lead the training. SADF ¶49. This evidence allows a reasonable jury to find that Fort Collins failed to adequately train and supervise its officers regarding the risks and appropriate uses of the rowing arm takedown, which was the moving force and proximate cause of Klamser's violation of Ms. Surat's constitutional rights. *See Ortega*, 994 F. Supp. 2d at 1039 (denying summary judgment to defendant on plaintiffs' failure to train claim because plaintiffs met each of the four prongs of the analysis under *Allen*, 119 F.3d at 841-42); *see* SADF ¶¶48, 50, 56.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss and Motion for Summary Judgment must be denied in their entirety.

Respectfully submitted this 30th day of November, 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ Helen Oh*
David A. Lane
Helen Oh
Andy McNulty
1543 Champa Street, Suite 400
Denver, Colorado 80202
dlane@kln-law.com
hoh@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 30th day of November 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will generate a Notice of Electronic Filing to the following email addresses:

**Mark Ratner**
**Brendon Desmond**
Hall & Evans, LLC
1001 Seventeenth Street, Ste 300
Denver, CO 80202
<u>ratnerm@hallevans.com</u>
<u>desmondb@hallevans.com</u>
303-628-3492

*Counsel for Defendants*

<u>*s/ Jamie Akard*</u>
Jamie Akard
KILLMER, LANE & NEWMAN, LLP